**William A. SUNDEL, Petitioner, Appellant,**

v.

**JUSTICES OF the SUPERIOR COURT OF the STATE OF RHODE ISLAND, Respondents, Appellees.**

**No. 83–1702.**

United States Court of Appeals, First Circuit.

Argued Jan. 6, 1984.

Decided Feb. 29, 1984.

Michael Young, New York City, for petitioner, appellant.

Kenneth P. Madden, Asst. Atty. Gen., with whom Dennis J. Roberts II, Atty. Gen., Providence, R.I., was on brief, for respondents, appellees.

Before CAMPBELL, Chief Judge, BREYER, Circuit Judge, and PETTINE,* Senior District Judge.

BREYER, Circuit Judge.

William Sundel was tried in Rhode Island state court on serious drug charges. David Breitbart, a New York lawyer, appeared *pro hac vice* to defend him, along with "associate" (or "local") counsel John

---

* Of the District of Rhode Island, sitting by desig-    nation.

O'Neill. O'Neill also represented Sundel's codefendant. During the course of pretrial proceedings, the trial judge began to fear that Breitbart's representation of his client was inadequate, perhaps because of Breitbart's ignorance of local rules and procedures. On the first day of trial, after observing Breitbart's efforts to cross-examine the policeman who had seized the drugs, the judge had a series of conversations with both counsel—some on the record and some off the record in chambers—about what he saw as Breitbart's inadequacies. The upshot was that the judge, referring as authority to *United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976), revoked Breitbart's permission to appear. He then asked Sundel whether he wished to proceed with O'Neill as counsel, represent himself, or obtain other counsel. O'Neill said that he believed there was a "conflict of interest." Sundel said that he would like to engage other counsel. The judge then took the case from the jury "at Mr. Sundel's request" and set a new trial date.

Subsequently Sundel argued that a new trial would violate the protection against "double jeopardy" provided by the fifth amendment. The Rhode Island Supreme Court ultimately rejected this argument on the ground that Sundel himself requested, or acquiesced in, the court's decision to remove Breitbart. *Compare Oregon v. Kennedy,* 456 U.S. 667, 679, 102 S.Ct. 2083, 2091, 72 L.Ed.2d 416 (1982). Sundel sought habeas in the federal district court. It was denied on the ground that, whether or not Sundel agreed to replace Breitbart, once the trial judge revoked Breitbart's permission to appear, Sundel himself sought a new trial. Sundel appeals the decision denying his habeas petition, 570 F.Supp. 1131.

We affirm the denial, for, in our view, the state trial judge correctly invoked the authority of *United States v. Dinitz, supra.* We find that case factually similar and legally indistinguishable. *Dinitz* involved a Florida trial of a defendant who was represented by a New York lawyer, Wagner, appearing *pro hac vice,* and a local counsel, Meldon. Wagner's behavior at the trial, as the Supreme Court described it, consisted of the following:

Wagner then began his opening statement for the defense. After introducing himself and his co-counsel, Wagner turned to the case against the respondent:

"Mr. Wagner: After working on this case over a period of time it appeared to me that if we would have given nomenclature, if we would have named this case so there could be no question about identifying it in the future, I would have called it The Case—

"Mr. Reed [Asst. U.S. Attorney]: Your Honor, we object to personal opinions.

"The Court: Objection sustained. The purpose of the opening statement is to summarize the facts the evidence will show, state the issues, not to give personal opinions. Proceed, Mr. Wagner.

"Mr. Wagner: Thank you, Your Honor. I call this the Case of the Incredible Witness." App. 20.

The prosecutor again objected and the judge excused the jury. The judge then warned Wagner that he did not approve of his behavior and cautioned Wagner that he did not want to have to remind him again about the purpose of the opening statement.

Following this initial incident, the trial judge found it necessary twice again to remind Wagner of the purpose of the opening statement and to instruct him to relate "the facts that you expect the evidence to show, the admissible evidence." *Id.,* at 82. Later on in his statement, Wagner started to discuss an attempt to extort money from the respondent that had occurred shortly after his arrest. The prosecutor objected and the jury was again excused. Wagner informed the trial judge of some of the details of the extortion attempt and assured the court that he would connect it with the prospective Government witness Cox. But it soon became apparent that Wagner had no information linking Cox to the extor-

tion attempt, and the trial judge then excluded Wagner from the trial and ordered him to leave the courthouse.

The trial judge asked Meldon if he would proceed. Meldon said he was not sufficiently prepared. The judge then asked the defendant if he wanted 1) a stay pending an application to appeal; 2) to proceed with Meldon (and a law professor Baldwin); or 3) a mistrial in order to obtain other counsel. The defendant asked for a mistrial, which was granted. 424 U.S. at 602–04, 96 S.Ct. at 1077–78.

■ Before his second trial, Dinitz argued that, on these facts, to retry him would put him in "double jeopardy." He said he had wanted to keep Wagner as his lawyer. Once Wagner was removed, given Meldon's lack of familiarity with the witnesses, he was "forced" to ask for a mistrial. Thus, the trial was terminated over his objection. Unless there was "manifest necessity" for doing so, a second trial was barred. *Arizona v. Washington,* 434 U.S. 497, 509, 98 S.Ct. 824, 832, 54 L.Ed.2d 717 (1978); *Illinois v. Somerville,* 410 U.S. 458, 463, 93 S.Ct. 1066, 1070, 35 L.Ed.2d 425 (1973); *see Oregon v. Kennedy,* 456 U.S. at 672–73, 102 S.Ct. at 2087–88.

The Supreme Court accepted Dinitz's premises, but rejected his conclusion. The Court agreed that Dinitz had not waived his right to proceed with Wagner. It said, however, that

> traditional waiver concepts have little relevance.... The important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed ...

after a serious trial court error (such as depriving Dinitz of his counsel assuming, for the sake of argument, that doing so was error). *United States v. Dinitz,* 424 U.S. at 609–10, 96 S.Ct. at 1080–81. Unless the judge's action in, say, removing Wagner "was motivated by bad faith or undertaken to harass or prejudice" the defendant, the Double Jeopardy Clause does not prevent a retrial as long as the defendant is offered the choice of continuing. *Id.* at 611, 96

S.Ct. at 1081. Otherwise trial judges would be tempted simply not to allow the defendant that choice; they would require the trial to proceed to its conclusion leaving the defendant with appeal and *retrial* as his only remedy. That is to say, the judge might have required Dinitz to proceed through a trial with Meldon as his lawyer. Dinitz, if convicted, would have had to appeal. And, according to the Court, "the Double Jeopardy Clause" would then "present no obstacle to a retrial." *Id.* at 610, 96 S.Ct. at 1081. Rather than encourage the trial judge to follow this complicated route to obtain a new trial, the Court held that a defendant's request for a mistrial, in these circumstances, will simply be taken at face value; the case will *not* be treated as one in which a new trial was ordered "over his objection;" thus a new trial will be permitted. *Id.* at 608–611, 96 S.Ct. at 1080–81; *see Oregon v. Kennedy,* 456 U.S. at 672, 102 S.Ct. at 2087.

■ Sundel seeks to distinguish *Dinitz* in three ways. First, he argues that Wagner's conduct was far more egregious than was Breitbart's. We do not agree. The trial judge lists, among other instances of doubtful conduct, the following:

1) Breitbart brought a motion to suppress evidence without showing his client's standing, a fact that, in the judge's view, was likely sufficient under Rhode Island law to doom the motion.

2) During the voir dire Breitbart questioned the jury in a way apparently aimed at suggesting that the key prosecution witness had a motive not to tell the truth. The prosecution objected, because the line of questioning seemed well beyond that permitted by R.I.R.Crim.P. 24, which allows questioning for the purpose of determining whether a prospective juror is

> related to a party, or has any interest in the case, or has expressed or formed an opinion or is sensible of any bias or prejudice therein.

Breitbart then stated, in the juror's hearing, "My question is with the individual motivation to lie." The judge rebuked

Breitbart for this and other departures from the rules.

3) Breitbart's opening statement to the jury referred several times to the key witness as having "lied," and as having "schemed." Canon 7 of the Rhode Island Canons of Ethics states that a lawyer shall not "assert his personal opinion . . . as to the credibility of a witness."

4) Breitbart's effort to cross-examine Corporal Malley, who seized the drugs, went well beyond the scope of direct examination, contrary to Rhode Island practice. Breitbart apparently was trying to use his cross-examination of this early witness to show that Hall, the key witness who would testify later, had made inconsistent statements. The prosecution objected, Breitbart was admonished by the judge, but Breitbart kept returning to this line of questioning.

Sundel seeks to defend Breitbart's conduct as proper under Rhode Island law. His arguments, as to some of these matters, are plausible; but as to others, they are weak. He points, for example, to Rhode Island cases that allow cross-examination beyond the scope of direct "to establish possible bias, prejudice or ulterior motives." *State v. O'Brien,* 412 A.2d 231, 233 (R.I. 1980); *State v. Bennett,* 405 A.2d 1181, 1183 (R.I.1979); *State v. Ragonesi,* 112 R.I. 340, 309 A.2d 851, 854 (1973). But these cases concern impeachment of the *witness being examined,* not impeachment of another witness who has not, as yet, even testified. Nor do we believe the trial judge took a few isolated matters out of context. Rather, we agree with the federal district judge, in this case, who was formerly an experienced Rhode Island trial attorney, when he notes that:

the trial judge seems, at the very least, to have had reasonable grounds to question Breitbart's familiarity with local practice and procedure, based on his filing and handling of motions, his conduct of jury voir dire, his opening statement, and his cross examination of Detective Malley.

Further, Wagner's conduct seems no more egregious than Breitbart's in any relevant sense. Wagner may have acted deliberately rather than through ignorance, but we do not see how that fact affects what was at issue in *Dinitz* (and here), namely defendant's right to counsel of his choice. Whether Wagner's or Breitbart's conduct was bad enough or incompetent enough to warrant removal is also beside the point, for in *Dinitz* the Supreme Court was willing to accept "the appellate court's conclusion that the trial judge overreacted in expelling Wagner from the courtroom." *United States v. Dinitz,* 424 U.S. at 611, 96 S.Ct. at 1081.

Finally, here, as in *Dinitz*

the respondent has not contended, and the record does not show that the judge's action was motivated by bad faith or undertaken to harass or prejudice the respondent.

*Id.*

Second, Sundel argues that the trial judge had greater reason than the judge in *Dinitz* to know that disqualification of Breitbart would likely lead to a new trial. He correctly points out that the judge knew O'Neill was representing a codefendant; prior to trial, a motion to sever had been made; thus, the judge was aware of a possibility of conflict of interest. There was no such apparent conflict in *Dinitz.*

This difference is not dispositive, however, for the trial judge did not know, nor could he even be reasonably sure, that Sundel would reject O'Neill as counsel. For one thing O'Neill had previously filed an appearance for Sundel as well as for the codefendant. For another, Breitbart's motion to appear stated

in my absence from any hearing or trial . . . my associate counsel [O'Neill] may act for and on my behalf in the conduct of such hearing or trial.

At most one might find a somewhat greater likelihood here, than in *Dinitz,* that disqualification would lead to a "new trial" choice. But, the language of *Dinitz* suggests that these shades of difference do not matter short of the point where the trial judge *knows* that the present trial must be aborted.

Third, Sundel argues at length that he did not "waive" his right to have Breitbart represent him. And, he adds that any such waiver must be "convincingly established on the record" as a waiver of a fundamental constitutional right. These "waiver" arguments, however, are precisely those rejected in *Dinitz. See United States v. Dinitz,* 424 U.S. at 609 n. 11, 96 S.Ct. at 1080 n. 11. The Court says that "waiver" is scarcely relevant; it *agrees* that defendant may face a "Hobson's choice" after a judge erroneously deprives him of counsel of his choosing. But, the Court's point is that defendants, faced with such errors, even horrendous ones, normally must wait until after they are convicted, then appeal, and, when vindicated, undergo a new trial. A defendant should not be *better off* (*i.e.* immune from trial) because the judge gives him the choice of the new trial in advance. This reasoning applies here.

Sundel's argument in essence is that of the *Dinitz* court of appeals. It is the argument that the Supreme Court rejected. We see no meaningful distinction. Thus, the decision of the district court must be

*Affirmed.*