Samuel **FUENTES**, Petitioner, Appellant,

v.

John **MORAN**, Director, Department of Corrections, Respondent, Appellee.

No. 83–1810.

United States Court of Appeals, First Circuit.

Argued Nov. 7, 1983.

Decided May 4, 1984.

Paula Rosin, Asst. Public Defender, Providence, R.I., Appellate Division, with whom William F. Reilly, Public Defender, Providence, R.I., was on brief, for appellant.

Anthony F. DelBonis, Sp. Asst. Atty. Gen., Providence, R.I., with whom Dennis J. Roberts II, Atty. Gen., Providence, R.I., was on brief, for appellee.

Before CAMPBELL, Chief Judge, COFFIN and BREYER, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

Samuel Fuentes appeals from the denial of his petition for habeas corpus by the United States District Court for the District of Rhode Island.

## I.

Fuentes was convicted in 1978 of the first-degree murders of Helen and Jane Dias. Fuentes's petition claims that police conduct in the course of the murder investi-

gation violated his rights under the fifth, sixth and fourteenth amendments. We recite the factual details of the investigation, keeping in mind our duty "to accord a presumption of correctness to state-court findings of fact." *Sumner v. Mata,* 455 U.S. 591, 592, 102 S.Ct. 1303, 1304, 71 L.Ed.2d 480 (1982).

On or about February 21, 1978, Jane Dias and her mother, Helen Dias, disappeared. The Providence police were alerted to the disappearance and began a serious investigation on March 2, 1978. The officers in charge, Detectives Springer and Mitchell, learned that Jane Dias was romantically involved with Fuentes and that the two had quarreled on February 21, the day of the disappearance. Springer and Mitchell, accompanied by Pawtucket police, sought to interview Fuentes at his Pawtucket address. Unable to find Fuentes, Springer and Mitchell returned to Providence after requesting the Pawtucket officers' assistance in locating Fuentes.

Upon their return to Providence, Mitchell telephoned attorney John Ruginski because Mitchell and Springer had been told that Ruginski had represented Fuentes in past legal matters. Mitchell asked Ruginski if he knew of Fuentes's whereabouts, and Ruginski responded that he had been with Fuentes in the Providence Superior Court earlier that day. Mitchell asked for Ruginski's assistance in locating Fuentes so he could be questioned regarding the disappearance of Jane and Helen Dias. Ruginski asked if Fuentes was a suspect, and Mitchell replied in the negative, saying that Fuentes was only wanted for questioning. Ruginski then volunteered that he had already discussed the disappearance with Fuentes, and that Fuentes had said he had no knowledge of the whereabouts of the two women. Ruginski told Mitchell that if he located Fuentes he would bring him to the police station for questioning.

On the morning of March 3, Fuentes was arrested by the Pawtucket police pursuant to a bench warrant issued by a Providence district court for failure to pay a $103.50 fine. Springer and Mitchell were notified and subsequently brought Fuentes to Providence, ostensibly for a hearing on the bench warrant. Fuentes arrived at the Providence police station at noon and was advised of his *Miranda* rights. Fuentes indicated that he understood his rights, that he did not want an attorney, and that he was willing to talk to the police. Fuentes was informed that he was a suspect in the disappearance. He claimed he had last seen Jane and Helen Dias on February 21 after his argument with Jane, and that he did not know where they were. Springer intimated that Fuentes "may have done away with [the Diases]," to which Fuentes responded, "you have no proof. You have no corpus delicti." The interrogation ceased. Due to a snow storm no judge could be located that afternoon, and Fuentes was kept in custody overnight.

Some time after noon on March 4, Mitchell and Springer discovered the bodies of Helen and Jane Dias buried in the dirt floor adjacent to their basement apartment. The officers promptly telephoned the station to ascertain whether or not Fuentes was still in custody. Informed that Fuentes was still in custody due to the continuing unavailability of a judge, Springer and Mitchell returned to the police station. At approximately 4:00 p.m. Springer and Mitchell arrived and began interrogating Fuentes about the murders. Fuentes was again informed of and again waived his *Miranda* rights. After viewing a photograph of the two bodies, Fuentes confessed. By 6:40 p.m. Fuentes's admissions were typed in a six-page statement, which he signed.

Meanwhile, at approximately 3:20 p.m., Ruginski had telephoned the Providence police station inquiring about Fuentes. Ruginski spoke with a Detective Ethier, who stated that Fuentes was in custody on a bench warrant and nothing more. Ruginski asked whether the bench warrant originated in superior or district court. Ethier left the telephone momentarily and then informed Ruginski that a state district court judge had issued the bench warrant. Ruginski asked how he could secure Fuentes's release, and Ethier told him he

would have to contact Springer or Mitchell, who were not present at the time. Ruginski decided to attend to other business and did not call back for approximately four hours. Mitchell at that time informed him that Fuentes had confessed to the double homicide and was being held on two counts of first-degree murder. Ruginski hastened to the station and conferred with Fuentes.

Fuentes's pre-trial motion to suppress his confession on fifth, sixth and fourteenth amendment grounds was denied by the Rhode Island trial justice. The denial was affirmed by the Rhode Island Supreme Court. *State v. Fuentes*, 433 A.2d 184 (R.I.1981). He subsequently filed the instant petition for a writ of habeas corpus in the federal district court. The petition was referred to a magistrate who recommended that the petition be granted. The district court rejected the recommendation and denied the petition. *Fuentes v. Moran*, 572 F.Supp. 1461 (D.R.I.1983). We affirm.

## II.

Fuentes presents three theories for overturning his conviction. First, he contends that the failure of the police to apprise Ruginski of the scope of the investigation denied Fuentes his sixth amendment right to counsel. Second, he argues that the police conduct violated his fifth amendment rights and rendered his waiver of those rights void. Third, Fuentes asserts that the officers' course of conduct was so outrageous as to constitute a breach of fundamental fairness under the fourteenth amendment.

As an initial matter, we agree with the district court that Fuentes presented each of these theories to the Rhode Island courts and has accordingly exhausted his state remedies. *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). We therefore turn to the merits of his claims.

### A.  *Sixth Amendment*

The events at issue occurred before formal judicial proceedings were begun against Fuentes. The state supreme court and the district court both concluded that Fuentes was not protected by the sixth amendment at this early stage of the investigation. The Supreme Court, however, has applied the sixth amendment to pre-indictment custodial interrogation. *Escobedo v. Illinois*, 378 U.S. 478, 491, 84 S.Ct. 1758, 1765, 12 L.Ed.2d 977 (1964). In *Escobedo* the suspect's requests to see his attorney had been denied by police, as had his attorney's requests to consult with his client. *Id.* at 480–82, 84 S.Ct. at 1759–61. The Court concluded that such interference with the attorney-client relationship at a time when the investigation had focused on the suspect violated the suspect's sixth amendment rights. The Court has subsequently dealt with problems of pre-indictment custodial interrogation under the fifth amendment, *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and has limited *Escobedo* to its particular facts. *Michigan v. Tucker*, 417 U.S. 433, 438, 94 S.Ct. 2357, 2360, 2361, 41 L.Ed.2d 182 (1974); *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972) (plurality opinion); *Johnson v. New Jersey*, 384 U.S. 719, 733–34, 86 S.Ct. 1772, 1780–81, 16 L.Ed.2d 882 (1966).

We do not believe that *Escobedo* is controlling here. Neither Fuentes nor his purported counsel were denied requests to consult with one another. Fuentes asserts that the police deceived Ruginski regarding the progress of the investigation, and that such deceit denied Fuentes the assistance of counsel by lulling Ruginski into a false sense of non-urgency. To accept this argument would require a strained reading of the facts and the law. During the March 2 telephone call, Mitchell informed Ruginski of the officers' desire to question Fuentes about the disappearance and asked for Ruginski's aid in finding Fuentes. Fuentes contends that Mitchell lied to Ruginski by stating that Fuentes was not a suspect when in fact he had tried to arrest Fuentes earlier that day. But Mitchell and Springer had only attempted to question Fuentes regarding the disappearance. The investi-

gation was still in its infancy; the women's bodies had not yet been discovered; it remained uncertain whether a crime had been committed and of what nature. While the police doubtless had suspicions based on Fuentes's quarrel with Jane Dias on February 21, the fragmentary state of the available information still left Fuentes's status, technically, in a somewhat gray area. In any case, as Mitchell discovered, Ruginski had the information necessary to assess for himself his client's predicament. Any understatement in Mitchell's response that Fuentes was not a "suspect," but was merely wanted for "questioning," could scarcely have deceived the lawyer. Mitchell had informed Ruginski of the event—the Diases' disappearance—for which he wanted to question Fuentes, and Ruginski told Mitchell that he and Fuentes had discussed both the women's disappearance and Fuentes's possible involvement that very morning. As Ruginski had recently defended Fuentes on a charge of assaulting one of the two women, he could appreciate that Fuentes was a likely object of suspicion. We do not think the conversation can realistically be construed as an attempt to deceive, or as deceiving, Ruginski.

The March 4 call by Ruginski to the police station also did not involve any misrepresentation. At the time of the call Mitchell and Springer had radioed the station but had not yet returned from the murder scene: Fuentes was still being held pursuant to the bench warrant. Fuentes argues that Ethier must have been aware of the course of the Dias investigation and thus deceived Ruginski by not informing him of the mounting suspicion about Fuentes's involvement. Fuentes asserts that Ethier's instruction to Ruginski to call Springer or Mitchell warrants the inference that Ethier was informed of the progress of the investigation, particularly in view of the seriousness of the suspected crime. He garners support for this inference from the fact that Springer and Mitchell had radioed the police station to check on Fuentes's status not long before Ruginski's call. While the state of Ethier's knowledge is open to conjecture, on balance we reject the contention that the failure to fully inform Ruginski was a harmful deception. In light of Mitchell's prior conversation with Ruginski regarding the Dias probe, when Ethier told Ruginski to call back and speak with Springer or Mitchell, Ruginski could scarcely have been unaware that Fuentes would be questioned about the disappearance. Yet Ruginski neither inquired about the investigation nor requested to be present during any interrogation. Instead he pursued other business until four hours later. This failure to actively pursue his purported client's interests undermines any claim that the police had an obligation to keep him fully informed. *See generally United States v. Masullo*, 489 F.2d 217, 221–24 (2d Cir.1973) ("The concept that professional criminals have 'house counsel' because of prior escapades and that therefore Government agents knowing the identity of prior counsel have an obligation of constitutional or even ethical dimension to contact counsel before questioning them, is hardly appealing.").

The Supreme Court has said that "*Escobedo* is not to be broadly extended beyond the facts of that particular case," *Michigan v. Tucker*, 417 U.S. at 438, 94 S.Ct. at 2360, 2361. We hold that the police conduct here did not constitute such interference with any attempt by Ruginski to confer with Fuentes as to violate Fuentes's sixth amendment right to counsel. *Hance v. Zant*, 696 F.2d 940, 947 (11th Cir.), *cert. denied*, —— U.S. ——, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983).

### B. *Fifth Amendment*

The Supreme Court has recognized that "the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege ...." *Miranda v. Arizona*, 384 U.S. at 469, 86 S.Ct. at 1625. Interrogation without the presence of counsel is permissible, but "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and

his right to retained or appointed counsel." *Id.* at 475, 86 S.Ct. at 1628.

Fuentes asserts that the police conduct interfered with his right to counsel under the fifth amendment. The state courts found that Fuentes had voluntarily, knowingly and intelligently waived his fifth amendment rights. Fuentes asserts, however, that the conduct of the police rendered his alleged waiver void. He claims that the failure to notify him of Ruginski's inquiry on his behalf caused his waiver to be unknowing. The question of waiver must be decided based on " 'the particular facts and circumstances surrounding [this] case, including the background, experience, and conduct of the accused.' " *North Carolina v. Butler,* 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1757–58, 60 L.Ed.2d 286 (1979) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). *See also Oregon v. Bradshaw,* —— U.S. ——, ——, 103 S.Ct. 2830–35, 77 L.Ed.2d 405 (1983).

Fuentes was not unfamiliar with criminal proceedings: he had been involved in at least two criminal prosecutions in the preceding year. In one case he had discharged Ruginski as his attorney and was proceeding to trial pro se. The state court found that Fuentes had attended Rhode Island Junior College for two semesters and had a command of English adequate to fully understand his rights. The police read Fuentes his *Miranda* rights and he agreed to waive them. Fuentes also signed the typewritten confession containing a written waiver of rights. Under these circumstances the state court's finding that Fuentes knowingly and intelligently waived his fifth amendment rights is clearly supportable.

Fuentes argues that the waiver was secured by a trick, *i.e.,* the failure to fully inform him. "Trickery" by the police can vitiate a fifth amendment waiver, *Miranda v. Arizona,* 384 U.S. at 476, 86 S.Ct. at 1628, 1629, but we do not think the failure to inform Fuentes of Ruginski's call constituted trickery. Fuentes and Ruginski had an ongoing professional relationship; Ruginski had been in court with Fuentes on March 2, just two days prior to the confession. Fuentes, therefore, knew not only of his right to counsel but of Ruginski's availability should he wish to obtain him. The police were hardly withholding vital information from Fuentes in not actively informing him of Ruginski's phone call. *See Hance v. Zant,* 696 F.2d 940, 947 (11th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983); *United States v. Brown,* 569 F.2d 236, 239 (5th Cir.1978) (en banc).

This is not a case where a defendant is held incommunicado while police attempt to extract a confession. *See Darwin v. Connecticut,* 391 U.S. 346, 349, 88 S.Ct. 1488, 1489, 1490, 20 L.Ed.2d 630 (1968). Nor was Fuentes lied to about the availability of requested counsel. *See Escobedo v. Illinois,* 378 U.S. at 481, 84 S.Ct. at 1760 (defendant told his attorney "didn't want to see" him). The officers merely failed to volunteer to Fuentes that Ruginski had made a half-hearted inquiry as to Fuentes's status. This conduct does not warrant the label "trickery" and does not vitiate Fuentes's fifth amendment waiver. At the same time some of the questions or contrary inferences we have noted indicate how careful law enforcement officials must be in dealing with suspects and lawyers during the investigatory phase of a prosecution.

### C. *Fourteenth Amendment*

Fuentes argues that the police conduct was so egregious as to constitute a violation of fundamental fairness under the fourteenth amendment. Even assuming, which we do not decide, that the fourteenth amendment provides protection in this case greater than that offered by the fifth and sixth amendments, we do not think the facts here " 'offend those canons of decency and fairness which express the notions of justice of English-speaking people even toward those charged with the most heinous offenses.' " *Rochin v. California,* 342 U.S. 165, 169, 72 S.Ct. 205, 208, 96 L.Ed. 183 (1952) (quoting *Malinski v. New*

*York,* 324 U.S. 401, 416–17, 65 S.Ct. 781, 788–89, 89 L.Ed. 1029 (1945) (Frankfurter, J., concurring)).

For the foregoing reasons we affirm the district court's denial of the petition for habeas corpus.

*Affirmed.*