Brian K. **BURBINE**, Petitioner,

v.

John **MORAN**, Director, Department of Corrections, Respondent.

Civ. A. No. 83–0293 S.

United States District Court, D. Rhode Island.

June 7, 1984.

William F. Reilly, Public Defender, Paula Rosin, Asst. Public Defender, Appellate Div., Providence, R.I., for petitioner.

Dennis J. Roberts II, Atty. Gen., Joel D. Landry, Asst. Atty. Gen., Anthony F. DelBonis, Sp. Atty. Gen., Providence, R.I., for respondent.

## OPINION AND ORDER

SELYA, District Judge.

This is an application for a writ of habeas corpus brought pursuant to 28 U.S.C. §§ 2241 and 2254. The petitioner, Brian K. Burbine, is currently incarcerated at a state penitentiary. The defendant is the director of Rhode Island's department of corrections.

This proceeding had its origins in the brutal and senseless slaying of a young woman, Mary Jo Hickey, in Providence, Rhode Island, in March of 1977. Burbine was indicted for the crime, tried before a state superior court jury in early 1979, and found guilty of murder in the first degree.[1]

---

1. The trial began on February 21, 1979 and ended on March 2, 1979. The trial transcript

He was sentenced to life imprisonment. His appeal to the state supreme court was initially rejected by an equally divided court. *State v. Burbine,* 430 A.2d 438 (R.I.1981) (*Burbine I*). A petition for reargument was granted, however, some six weeks later. At full strength for the second go-round, a sharply splintered state supreme court again affirmed the conviction. *State v. Burbine,* 451 A.2d 22 (R.I. 1982) (*Burbine II*) The instant application, filed in this court on April 28, 1983, ensued in due course.

After issue had been joined, the petitioner moved to consolidate his application for hearing with the then-pending petition of Samuel Fuentes, No. 82–0071S (despite the fact that Fuentes had been convicted in a separate trial on charges arising from entirely unrelated offenses). Burbine's motion postulated "that both petitions raise precisely the same legal issues." Fuentes and Burbine, it should be noted, shared common counsel.

This court, in August of 1983, denied Burbine's motion to consolidate, without opinion. Shortly thereafter, the Fuentes application was argued here and was dismissed. *Fuentes v. Moran,* 572 F.Supp. 1461 (D.R.I.1983) (*Fuentes I*). Fuentes, nothing daunted, appealed the adverse decision.

The court then conferred with counsel in the instant case on October 21, 1983 (the merits having been fully briefed prior thereto). By agreement, proceedings in this cause were held in abeyance (although no formal stay was entered) pending the decision of the court of appeals in respect to Fuentes' appeal. In May of 1984, the First Circuit issued its opinion affirming *Fuentes I. Fuentes v. Moran,* 733 F.2d 176 (1st Cir.1984) (*Fuentes II*). This court promptly ordered the filing of supplemental briefs "addressing this case in the albedo of *Fuentes [II]*." Following the submission of these briefs, oral arguments were heard on May 31, 1984. Decision was reserved.

## I. *Factual Background*

■ The facts germane to Burbine's application are fully and fairly set out in Justice Weisberger's majority opinion in *Burbine II,* and it would be pleonastic to repeat them in an exegetic fashion here. It suffices merely to highlight the most pertinent data, paying heed withal to the obligation of a federal court in a proceeding of this genre "to accord a presumption of correctness to state-court findings of fact." *Sumner v. Mata,* 455 U.S. 591, 592, 102 S.Ct. 1303, 1304, 71 L.Ed.2d 480 (1982).

The key sequence of events implicated by the instant petition occurred some three months after Hickey's death, when Cranston, Rhode Island police arrested three men, Burbine included, in connection with a break-in. The trio of suspects were brought to the Cranston police station subsequent to 3:00 p.m. on June 29, 1977. One of the Cranston detectives, Ferranti, was then in possession of a lead in respect to Hickey's death, received from a police tipster. After Burbine's arrest, Ferranti put one and one together, accurately arrived at two, and confronted Burbine vis-a-vis the Hickey affair. He informed Burbine of his rights as required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Burbine, at that time, declined to sign a waiver-of-rights form, and Ferranti went no further with him. Ferranti was cognizant, of course, that Hickey's murder had occurred not in Cranston, but in Providence.

While Burbine remained alone in an interrogation room, Ferranti proceeded to question Burbine's putative accomplices on the breaking-and-entering charge. He extended his questioning to the Hickey homicide, and gleaned from them further information which tended to tie Burbine more tightly into that killing. Ferranti, his sus-

(TT) comprises two volumes. Pre-trial motions, including the all-important suppression hearing, were aired from February 15 through February 20 of the same year. Those proceedings are contained in a separate transcript volume (MT), except for Judge Orton's *ora sponte* bench decision denying the motion to suppress, reported at TT 1–7. This court has reviewed the entire trial record, and notes that the evidence of Burbine's guilt was nothing short of overwhelming.

picions bolstered, then called the Providence police. Three Providence officers (Captain Wilson, Lt. Gannon, Detective Trafford) immediately sojourned to Cranston for the express purpose of questioning Burbine about Hickey's murder. They arrived at approximately 7:00 p.m., spoke with Ferranti, and interrogated Sparks (one of the two men who had been arrested with the petitioner). Gannon and Trafford proceeded to quiz Burbine, with Ferranti present.

Before that examination got underway, however, a parallel series of events began to unfold. Burbine, in connection with other pending criminal charges, was then being represented by attorney Richard Casparian, of the state public defender's office. At approximately 7:45 that evening, Burbine's sister (unbeknownst to him) called the public defender's office seeking to locate Casparian to enlist his aid in connection with Burbine's most recent arrest. She had no inkling at that time that her brother had been implicated in Hickey's demise. Her sole concern was the break-in. Casparian was not about; but the caller reached attorney Barbara Hurst, an appellate specialist in the same office. Hurst, after unsuccessfully trying to reach Casparian, advised attorney Allegra Munson, also an assistant public defender, of Burbine's predicament. By a quarter past 8:00, Munson placed a telephone call to Cranston police headquarters. Justice Weisberger's summary of what next occurred need not be embellished:

> At approximately 8:15 p.m., Ms. Munson called the Cranston police station and asked that her call be transferred to the detective division. A male voice responded with the word "Detectives." Ms. Munson identified herself and asked if Brian Burbine was being held; the person responded affirmatively. Ms. Munson explained to the person that Burbine was represented by attorney Casparian who was not available; she further stat-

ed that she would act as Burbine's legal counsel in the event that the police intended to place him in a lineup or question him. The unidentified person told Ms. Munson that the police would not be questioning Burbine or putting him in a lineup and that they were through with him for the night. Ms. Munson was not informed that the Providence police were at the Cranston police station or that Burbine was a suspect in Mary's murder.

*Burbine II*, 451 A.2d at 23–24.

Contrary to the information imparted to attorney Munson, the Providence police were continuing to question Burbine about Hickey's demise—although the interrogation by Cranston police as to the break-in which had led to the petitioner's arrest was, for aught that appears, ancient history by that time.[2] Munson's call, of course, did not focus at all on the homicide investigation; she was apparently unaware of it at the moment in question. Munson did not ask to speak with Burbine, nor did she inquire as to why he was in custody (MT. 256). It should likewise be noted that there was absolutely no evidence to indicate that the Providence investigators (or Ferranti, for that matter) were made aware of Munson's call until long after the cat was wholly out of the bag.

It is incontrovertible that, as the evening wore on, Burbine was fully apprised of his *Miranda* rights on at least two occasions, executed a brace of waiver-of-rights forms, signed a confession shortly after 10:00 p.m., and signed a second inculpatory statement an hour later. The next morning, he appeared in state district court in regard to the breaking-and-entering charge; he was thereafter again interrogated by the Providence police, waived his rights once more, and gave a third written statement anent the Hickey affair. Burbine's indictment followed apace.

At a pre-trial suppression hearing in the state superior court, the petitioner attempt-

---

**2.** The trial justice found as a fact that Munson did make this call (TT. 3), but further found that there was no chicanery, collusion or conspiracy on that part of the police "to secrete [Burbine] from his attorney." TT. 3–4. The state supreme court upheld these findings. *Burbine II*, 451 A.2d at 29–30 & n. 5.

ed in vain to thwart the prosecution's use at trial of the trilogy of confessions. The trial justice found that Burbine knowingly, intelligently and voluntarily waived his privilege against self-inculpation, and that his right to counsel had not impermissibly been abridged (TT. 6–7). The state thereafter profitably employed the three incriminating statements before the jury. And, subsequent to Burbine's conviction and sentencing, the state supreme court held that suppression was not required. *Burbine II,* 451 A.2d at 31.

### II. *Contentions of the Parties*

The applicant makes, at bottom, a trio of contentions. He asseverates that the multiple confessions were euchred from him in violation of (i) his sixth amendment right to counsel, (ii) his fifth amendment right against self-incrimination, and (iii) his fourteenth amendment right to due process. The respondent challenges the applicability of the sixth amendment to these facts (and, in any event, sees no sixth amendment infringement); asserts that the finding of voluntariness is supportable and undercuts the fifth amendment claim; and urges that the petitioner in all material respects received process that was due. Further, the state treats *Fuentes II* as both controlling and dispositive (although conceding at oral argument that the instant proceeding presents a "closer case"); the petitioner, who originally sought to consolidate this case with Fuentes' application on the ground that the two involved identic legal issues, *see* text *ante,* now attempts to distinguish *Fuentes II* in divers ways.

The state does not contest the applicant's claim that the state courts have heretofore had "a meaningful opportunity to confront the federal constitutional claims," *Sundel v. Justices of the Superior Court,* 570 F.Supp. 1131, 1133 (D.R.I.1983), *aff'd,* 728 F.2d 40 (1st Cir.1984), which are asserted here; and concedes that the petitioner has, therefore, duly exhausted his state remedies as mandated by 28 U.S.C. §§ 2254(b), (c). Perscrutation of the record bears out that Burbine presented each of the theses posited in this proceeding to the Rhode Island courts and that he has run the gamut of available state redress. *Rose v. Lundy,* 455 U.S. 509, 515–18, 102 S.Ct. 1198, 1201–03, 71 L.Ed.2d 379 (1982); *Fuentes I,* 572 F.Supp. at 1466.

Thus, the court is free to turn to the substantive arguments advanced by the petitioner (each of which will be addressed seriatim).

### III. *The Sixth Amendment*

■ The sixth amendment to the United States Constitution provides in pertinent part that the accused shall have "the Assistance of· Counsel for his defence." In *Fuentes I,* this court held that, in the absence of the prior commencement of formal charge proceedings, "arrest and questioning do not ... trigger the requirement of counsel under the Sixth Amendment." *Fuentes I,* 572 F.Supp. at 1467. The First Circuit, however, found it unnecessary to resolve whether or not the sixth amendment, generically, was applicable to pre-indictment custodial interrogation, *Fuentes II,* 733 F.2d at 179–80; and Burbine, contending that his case is a far more exacerbated instance than was *Fuentes,* has seized upon the First Circuit's prudential circumvention of the issue as an invitation to pursue the sixth amendment onslaught with renewed vigor.

In the interim, however, the Supreme Court has erased any uncertainty on this point. In *United States v. Gouveia,* — U.S. ——, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984), the Court held flatly "that the right to counsel attaches only at or after the initiation of adversary judicial proceedings against the defendant." *Id.* at ——, 104 S.Ct. at 2297. Given a fresh holding of the highest tribunal in the land, squarely on point, further comment by this court would be gratuitous. Adherence to the teachings of *Gouveia* demands that Burbine's assault upon his conviction, insofar as that attack utilizes sixth amendment weaponry, must be rejected. *Gouveia,* however, does not foreclose a challenge based on a putative violation of the fifth amendment.

## IV. *The Fifth Amendment*

### A. *The Legal Standard*

The fifth amendment of the Constitution insists inter alia that no person "shall be compelled in any criminal case to be a witness against himself." Burbine's case, viewed from this perspective, advances a much nicer question.

██ The generalized origins and nature of the prophylaxy to which an individual subject to custodial interrogation is entitled in order to safeguard his or her right against auto-incrimination has been discussed in considerable detail both by this court in *Fuentes I,* 572 F.Supp. at 1468–71, and by the court of appeals in *Fuentes II,* 733 F.2d at 180–81; and it would serve no useful purpose to parrot that prescription here. It suffices to say that the *per se* rule urged by the petitioner, which would in essence mandate the automatic exclusion of any statements made by an accused if a lawyer tried to contact the suspect and the fact of such attempted communication was not seasonably called to the person's attention,[3] was expressly eschewed by this court in *Fuentes I,* 572 F.Supp. at 1469–71,[4] and was spurned *sub silentio* by the First Circuit in *Fuentes II.* "(T)here is scant warrant, from a federal constitutional perspective, in imposing such a bright-line demarcation." *Fuentes I,* 572 F.Supp. at 1470. The preferred approach is one which measures the assailed conduct in the totality of the circumstances in order to determine "whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979).

Proper performance of this distillation perforce lends itself to an idiocratic case-by-case approach. After all,

[T]he relationship of the suspect to the attorney, the extent of the knowledge enjoyed by the authorities, the nature of the lawyer's request, and all kindred factors, become part and parcel of the "totality of the circumstances" which must in all events be sifted and weighed in determining whether or not a free and sentient waiver of the rights to remain silent and to the presence of an attorney has been effectuated.

*Fuentes I,* 572 F.Supp. at 1470 (citations omitted).

And, as Chief Judge Campbell observed in *Fuentes II,* 733 F.2d at 181:

The question of waiver must be decided based on " 'the particular facts and circumstances surrounding [this] case, including the background, experience, and conduct of the accused.' " *North Carolina v. Butler,* 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1757–58, 60 L.Ed.2d 286 (1979), (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)).

It follows inexorably that a federal court, sitting in habeas review of a state court conviction, must

abjure the easy lure of disposing of cases by choosing among a series of neatly-labelled pigeonholes, and turn to the more demanding task of analyzing the full panoply of facts and circumstances which impacted upon the petitioner's actions in the case at bar.

*Fuentes I,* 572 F.Supp. at 1471.

### B. *The Totality of the Circumstances*

██ There can be no question about Burbine's right to the presence of counsel at and during his interrogation by the police. *Miranda,* 384 U.S. at 469, 86 S.Ct. at 1625; *Fuentes II,* 733 F.2d at 180. While this right can be relinquished, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against

---

**3.** A representative litany of state court cases adopting, and fully explicating, the *per se* rule are collected in *Fuentes I,* 572 F.Supp. at 1469–70. Rhode Island, it should be noted, has declined to ride upon this bandwagon. *E.g., Burbine II,* 451 A.2d at 29–30.

**4.** To reiterate this court's earlier conclusion, *Fuentes I,* 572 F.Supp. at 1471:

In sum, this court finds the *per se* rule ... to be an artificial barrier to law enforcement warranted neither by constitutional precedent nor by common sense.

self-incrimination and his right to retained or appointed counsel." *Id.*, quoting *Miranda*, 384 U.S. at 475, 86 S.Ct. at 1628. *See also United States v. Montgomery*, 714 F.2d 201, 203–04 (1st Cir.1983). In calibrating the scales so as to weigh whether or not the state has shouldered its burden in this case, substantial deference must be paid to the state court's findings of historical fact. *Sumner v. Mata*, 455 U.S. at 597, 102 S.Ct. at 1306–07.[5]

Burbine asserts that the conduct exhibited by the police derailed Munson's efforts to assist him and interfered with his fifth amendment right to the attendance of counsel during his questioning. The issue cannot be framed in terms of hampering Munson's endeavors, however; as this court remarked at a comparable juncture in *Fuentes I:*

> The sockdolager is simply this: petitioner's right against self-incrimination is personal; it cannot be invoked or waived by anyone other than the person to whom the right attaches... Even if [the police] conduct infringed on an existing attorney-client relationship..., it could not violate petitioner's Fifth Amendment right not to incriminate himself unless the conversation itself somehow affected *petitioner's* capacity to invoke his rights.

572 F.Supp. at 1469 (emphasis in original) (citations omitted).

Burbine was not unfamiliar with the ritual of criminal proceedings: not only was he involved, immediately prior to this arrest, with the defense of unrelated criminal charges against him, but he displayed this knowledge in declining Ferranti's initial attempt to secure a waiver-of-rights. There is nothing in the record to suggest that Burbine was illiterate or lacked the capacity to understand or to appreciate his rights; in point of fact, the trial justice found to the contrary—and this finding is bottomed upon constitutive evidence.

■ A close reading of the testimony, particularly that of Gannon, reveals that Burbine was advised of the full spectrum of his constitutional prerogatives in a thorough, indeed meticulous, manner (*e.g.*, MT. 24–30, 34–37); that he acknowledged his comprehension of those rights (*e.g.*, MT. 25, 34); and that he specifically agreed to speak with the Providence officers without the presence of counsel. *E.g.*, MT. 27, 63. There is no suggestion here of police brutality, or of coercion, psychological duress, illicit inducement, intimidation, or the like. Burbine was not grilled for long stretches of time, nor in unusually oppressive circumstances. Here, as in *Fuentes*, the "mark of the Inquisition in no way blemishes these proceedings." *Fuentes I*, 572 F.Supp. at 1471.

■ Moreover, Burbine was at the time being represented by Casparian in connection with another criminal case; indeed, the record shows that he had a scheduled appointment with the attorney on the very day of his apprehension by the Cranston police. Absent the most convenient sort of selective amnesia, he must have been aware that contact with Casparian was among his options as the interrogation began and continued. He did not avail himself of any of his multiple opportunities to do so. The record (*e.g.*, MT. 23) reveals that a telephone was available to him at all times. As late as the beginning of his third confession (shortly after noon on June 30), he told Trafford that he did not want the services of counsel. *E.g.*, MT. 93, 95. Viewed in this light, the failure of the gendarmie to inform him that Munson had called appears harmless. As Justice Weisberger fittingly observed (*Burbine II*, 451 A.2d at 29):

> The evidence is overwhelming in support of the trial justice's finding that he [Burbine] was admonished of the right to

---

5. The finding upholding Burbine's waiver and branding it as voluntary is, of course, on a different footing; this court must make an independent determination on those issues, applying appropriate constitutional precepts to the subsidiary assessments of historical fact espoused

by the state judiciary. *Brewer v. Williams*, 430 U.S. 387, 397 n. 4, 97 S.Ct. 1232, 1238–39 n. 4, 51 L.Ed.2d 424 (1977); *Martineau v. Perrin*, 601 F.2d 1196, 1198 (1st Cir.1979); *Fuentes I*, 572 F.Supp. at 1471.

remain silent and of his right to retained or appointed counsel. It hardly seems conceivable that the additional information that an attorney whom he did not know had called the police station would have added significantly to the quantum of information necessary for the accused to make an informed decision as to waiver. Indeed, the additional information seems somewhat inconsequential in the light of defendant's own knowledge as supplemented by the admonitions of the police officers.

■ Nor can Burbine persuasively argue that the failure of the police to inform him of Munson's call, or the alleged imparting of misleading information to the attorney, severally or collectively constituted chicanery sufficient to vitiate his seriatim waivers. While it is true that trickery can annul a superficially valid surrender of fifth amendment rights, *Miranda,* 384 U.S. at 476, 86 S.Ct. at 1628–29; *Fuentes II,* 733 F.2d at 181, that doctrine is not called into play on these facts. The trial justice specifically cleared the police of any collusion or attempt to deceive; and the state supreme court, *Burbine II,* 451 A.2d at 29–30 n. 5, presented an entirely plausible explanation for the seeming inconsistency in the trial court's findings (the superior court having coupled its exoneration of the police officers with a finding that Munson had indeed called). More importantly, Burbine had an ongoing professional relationship with the public defender's office; and, therefore, knew not only of his right to the assistance of counsel but of his entree to the public defender should he wish assistance from that source. The parallel to Fuentes' case is unmistakable. *See, e.g., Fuentes II,* 733 F.2d at 181. To borrow Chief Judge Campbell's phrase, the police

"were hardly withholding vital information" in failing to mention Munson's call to the applicant.[6] *Id. See also Hance v. Zant,* 696 F.2d 940, 947 (11th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983); *United States v. Brown,* 569 F.2d 236, 239 (5th Cir.1978) (en banc).

Finally, it should be noted that the petitioner waived his rights not on one isolated occasion, but three times within less than a day (on the last instance, after having been brought before a judicial officer). And, the second statement came about at Burbine's instigation, when he volunteered that he had forgotten to mention something of consequence in his first confession. MT. 33. At no time, apart from his declination of Ferranti's original invitation to talk,[7] did he essay to halt the questioning or to stand upon his right to remain silent—and the record reflects that he was specifically advised of his right to draw the line at any given point.[8] The record persuasively indicates that the Providence police were both painstaking and assiduous in their attention to the *Miranda* commandments. From and after Burbine's first contact with the Providence police, the course of his conduct "evidenced a firm, abiding, calculated, and continuing intention to waive his right against self-incrimination and his right to counsel." *Fuentes I,* 572 F.Supp. at 1473. He had several meaningful opportunities to maintain his silence, but he forebore. And, there is scant reason to believe that news of Munson's inquiry, even if revealed, would have constituted a consequential datum or would have deflected Burbine from his self-appointed rounds.

Burbine's case is, indeed, a more compelling one than Fuentes', on almost every score. His educational background and attainment appeared considerably less impos-

---

**6.** There was, of course, absolutely no evidence that any of the officers who participated in the investigation knew of Munson's inquiry; nor did the trial justice impute any such knowledge to them.

**7.** Even this demurrer was less than complete; Burbine did give Ferranti some helpful information anent his sobriquet and place of residence. *See, e.g., Burbine II,* 451 A.2d at 23.

**8.** In Lt. Gannon's words: "I made it clear to him that at anytime he wanted to, he could terminate the statement, and at anytime he felt he wanted to call a lawyer, once again, that he should terminate the statement and obtain a lawyer." MT. 29.

ing, his experience with the criminal justice system, while appreciable, was not so wide and varied, his behavior from and after the time of apprehension was a trifle less decisive, and the actions of the constabulary can be viewed as having sailed a little closer to the wind. Yet, the signal, while perhaps amber, does not glow red. Given the circumstances of the case as a whole, the state court's finding that the prosecution successfully sustained the weighty burden of establishing that petitioner's waiver was made sentiently, intelligently, and in the free exercise of volitional judgment is supportable. *See Fuentes, II,* 733 F.2d at 180–81.

## V. *The Fourteenth Amendment*

█ Like Fuentes before him, Burbine orchestrates a due process sirvente: his reprise is that the conduct of the police in connection with the extraction of the successive confessions was so dissonant as to deny him due process of law. But, his song is out of tune. This court held in *Fuentes I* that where "the official behavior [in question] stands squarely on the parade ground of the Fifth and Sixth Amendments; and it has passed muster under those amendments," there is no "justification for the courts to attempt to enlarge *Miranda* by subsuming Fifth and Sixth Amendment rights in a catch-all Fourteenth Amendment sweep." 572 F.Supp. at 1474. This court explained:

> If the police grant to the suspect the rights limned in *Miranda* and in *Kirby* [*Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972)], according to the tenor of the rule, then the suspect has been treated with all the equity required of the criminal justice system in that regard; and the slippery slope of fundamental fairness need not—and should not—be independently addressed in terms of the self-same subject matter.

*Id.*[9]

Though the court of appeals found it unnecessary to paint with so broad a brush

on this issue, *Fuentes II,* 733 F.2d at 181 ("Even assuming, which we do not decide, that the fourteenth amendment provides protection in this case greater than that offered by the fifth and sixth amendments ...."), Chief Judge Campbell went on to hold that no impermissible intrusion upon fundamental fairness had transpired. *Id.*

In the case at bar, this court continues to hew to the line drawn in *Fuentes I,* 572 F.Supp. at 1474. And, even if some more expansive prophylaxis can be read into the due process clause, the doings in this case do not " 'offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses.' " *Fuentes II,* 733 F.2d at 181, quoting *Rochin v. California,* 342 U.S. 165, 169, 72 S.Ct. 205, 208, 96 L.Ed. 183 (1952), (quoting *Malinski v. New York,* 324 U.S. 401, 416–17, 65 S.Ct. 781, 788–89, 89 L.Ed. 1029 (1945) (Frankfurter, J., concurring)). This court's remarks in *Fuentes I* seem equally appropriate here:

> Regardless of the desirability of the police conduct at bar, the petitioner could have insulated himself by invoking the protections of *Miranda*. The warnings accorded to him were full· and fair, and his opportunities to claim the privilege were manifold. His failure to do so cannot now redound to affect the efforts of the police. His neglect was his own; and that neglect cannot and should not be palmed off as violating a penumbrous Fourteenth Amendment (irrespective of what may seem to be less than complete professionalism on the part of the police). An application for habeas relief does not pivot on whether a district judge approves or disapproves of police methodology; the only issue, at bottom, is whether the legitimate constitutional rights of the petitioner have been abrogated in

---

9. *Kirby,* a plurality opinion of the Court, was the spiritual and intellectual forerunner of *Gouveia*. (406 U.S. at 689–90, 92 S.Ct. at 1882–83). While the force of *Kirby* may have been in some doubt during the decade following its announcement, and at the time the First Circuit ruled in *Fuentes II, Gouveia* has now entirely dissipated any such dubiety and has legitimized the primary tenets of *Kirby*. *See United States v. Gouveia,* —— U.S. at ——, 104 S.Ct. at 2297.

some meaningful way. No such abrogation occurred here.

*Fuentes I*, 572 F.Supp. at 1474–75 (footnote omitted).

### VI. *Conclusion*

For the foregoing reasons, the application for writ of habeas corpus is denied and dismissed.

*So ordered.*