[Crim. No. 23713. Oct. 2, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES CALEB HOUSTON, Defendant and Appellant.

598

**COUNSEL**

Stephen V. Bomse, Charles N. Freiberg, Eric R. Havian, Heller, Ehrman, White & McAuliffe and William Everett Glass for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Martin S. Kaye, Ann K. Jensen, Stan M. Helfman and Dane R. Gillette, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GRODIN, J.**—On the basis of his confession and the transcript of his preliminary hearing, defendant was convicted in a court trial of selling cocaine (Health & Saf. Code, § 11352) and conspiracy to sell cocaine (Pen. Code, § 182). He was placed on probation with a condition that he serve nine months in jail. He urges that his confession should not have been admitted, even though he waived his *Miranda* rights,[1] because the police

---

[1] *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

thereafter held him incommunicado, deliberately keeping him ignorant that a lawyer retained by friends to assist him was at the police station attempting to consult with him.

A majority of the United States Supreme Court has recently concluded that such tactics do not contravene federal law. Nonetheless, we agree with defendant that the police conduct at issue here violated defendant's *Miranda* rights as they apply in California, and also thwarted his separate California constitutional right of access to counsel at a "critical stage" of the proceedings against him.[2] They vitiated defendant's earlier waiver of counsel and rendered inadmissible any statements he made after his lawyer's arrival at the station. Like the trial court, we are unable to conclude beyond a reasonable doubt that defendant's confession occurred before that time. Hence, it should have been excluded from evidence, and his conviction must be reversed.[3]

## I. Facts

On July 11, 1980, about 6 p.m., Walnut Creek police and state narcotics authorities arrested Robert Fitz-Stephens in a Gemco parking lot when he displayed two pounds of cocaine to an undercover agent who had agreed to purchase it. While purchase negotiations were proceeding, the police had twice followed Fitz-Stephens to a residence defendant shared with his fiancée, Patricia Jarvis. During Fitz-Stephens' second visit, in the late afternoon of July 11, defendant left the house and returned about 20 minutes later. Within a few moments, Fitz-Stephens departed and went directly to the Gemco lot where he was arrested with the cocaine.

Persuaded that defendant had obtained the cocaine for Fitz-Stephens, the police arrested him shortly after 8 p.m. on July 11. They took him to the

---

[2]The procedures required by *Miranda* and its progeny are deemed necessary to protect the privilege against self-incrimination set forth in both the state and federal Constitutions. The California provision, contained in article I, section 15 of our Constitution, declares that "[p]ersons may not . . . be compelled in a criminal cause to be a witness against themselves . . . ." We have not been bound by federal interpretations of *Miranda* when applying it in the context of the state constitutional privilege. (See, e.g., *People* v. *Pettingill* (1978) 21 Cal.3d 231, 246-252 [145 Cal.Rptr. 861, 578 P.2d 108]; *People* v. *Disbrow* (1976) 16 Cal.3d 101, 113 [127 Cal.Rptr. 360, 545 P.2d 272].) Article I, section 15 also separately guarantees that "[t]he defendant in a criminal cause has the right . . . to have the assistance of counsel for the defendant's defense . . . ." Again, we have given force to this language independent of the corresponding provision of the federal Constitution. (See, e.g., *People* v. *Bustamante* (1981) 30 Cal.3d 88, 102 [177 Cal.Rptr. 576, 634 P.2d 927].)

[3]Application of the exclusionary rule in this case is not affected by Proposition 8 (see Cal. Const., art. I, § 28, subd. (d), as adopted by Initiative on June 8, 1982), since the conduct on which the criminal charge is based is alleged to have occurred well before the passage of the initiative. (See *People* v. *Smith* (1983) 34 Cal.3d 251, 262-263 [193 Cal.Rptr. 692, 667 P.2d 149].)

Walnut Creek police station and read him his *Miranda* rights, which he concedes he waived. Sometime before about 9:20 p.m., defendant confessed in detail his involvement in the narcotics transaction and agreed to cooperate in "setting up" his supplier.

Meanwhile, within minutes after defendant's arrest, two friends, Michael Crosno and Crosno's wife (who is Jarvis's sister), had driven by defendant's residence and noticed strange vehicles and people on the premises. They stopped and spoke briefly to Jarvis, who was still at the house but said she was also being taken into custody. Michael Crosno then called Attorney Brock Gowdy from a nearby pay phone. Gowdy, a partner in the San Francisco law firm of Brobeck, Phleger and Harrison, knew both Crosno and defendant and had given defendant legal advice in the past. Crosno asked Gowdy if he would represent defendant and Jarvis. Gowdy agreed.

Gowdy testified he called the Walnut Creek station at 8:40 p.m. and spoke with Sergeant Hennefer, who was one of the interrogating officers. Gowdy said he identified himself as an attorney and asked to speak to defendant and Jarvis. He requested that nothing further occur until he came to the station and said he would arrive shortly. According to Gowdy, Hennefer said he was "not sure" defendant and Jarvis were there, but if they were, he would relay the message.

Gowdy arrived at the station about 9 p.m. He spoke, among others, with Hennefer and Eugene Williams, a state narcotics agent who was also involved in questioning defendant. Gowdy testified that he again identified himself as an attorney representing defendant and Jarvis;[4] he asked to see them immediately. He was told questioning was not complete and was not permitted to speak to defendant for over an hour. Defendant was not told during this period that Gowdy had called or come to the station.

The trial court found beyond doubt that defendant's confession was voluntary. It also accepted that Gowdy had called and come to the Walnut Creek police station on the night of July 11. It determined, however, that it "[did] not know" whether defendant's confession came before or after Gowdy's attempted intervention. "If," said the court, "it must be proved by the People beyond a reasonable doubt and to a moral certainty, that inculpatory statements were completed before that occurred, the People have failed their burden."

---

[4] Gowdy said he told both the desk clerk and a uniformed officer she sent for that he was a lawyer "representing" defendant and Jarvis. Both Williams and Hennefer testified that Gowdy claimed to be present only as a family friend.

## II. Discussion

Defendant claims the police thwarted his constitutional right of access to his lawyer by rebuffing retained counsel's efforts to see him and by failing to inform him that the attorney was at the station seeking to consult with him. A majority of courts have so held on similar facts. These authorities conclude that when the police intentionally separate a suspect under interrogation from his lawyer who is trying to reach him, they interfere with the attorney-client relationship and directly breach the constitutional right to the assistance of retained or appointed counsel at all critical stages of a criminal prosecution. Further, the cases suggest, such tactics violate *Miranda*'s premise that access to counsel during a custodial interrogation, unless freely and knowingly waived, is a necessary adjunct to the privilege against self-incrimination.

In May 1964, the United States Supreme Court first concluded that the Sixth Amendment right to counsel extended to "critical" pretrial phases of a criminal proceeding. (*Massiah* v. *United States* (1964) 377 U.S. 201, 204-206 [12 L.Ed.2d 246, 249-251, 84 S.Ct. 1199].) A month later, the court decided that police violated the right to counsel when they denied the request of a suspect under "accusatory" interrogation to consult with a retained lawyer who had come to the station to see him. (*Escobedo* v. *Illinois* (1964) 378 U.S. 478, 486-492 [12 L.Ed.2d 977, 983-987, 84 S.Ct. 1758].) Even though criminal charges had not yet been filed, the court noted, the police had interfered with defendant's access to his counsel "'at the only stage where legal aid and advice could help him.'" (*Id.,* at pp. 484-485 [12 L.Ed.2d at p. 982], quoting *Massiah, supra,* at p. 204 [12 L.Ed.2d at p. 249], which in turn quoted *Spano* v. *New York* (1959) 360 U.S. 315, 326 [3 L.Ed.2d 1265, 1273, 79 S.Ct. 1202] [conc. opn. of Douglas, J.].) Though the high court limited *Escobedo* to its facts, this court quickly applied its reasoning to conclude that the Sixth Amendment required the police to advise a yet-uncharged suspect under "accusatory" interrogation of his right to a lawyer, appointed if necessary. (*People* v. *Dorado* (1965) 62 Cal.2d 338, 353-354 [42 Cal.Rptr. 169, 398 P.2d 361].)

Shortly after *Dorado* was decided, the United States Supreme Court issued its landmark decision in *Miranda*. ▮ There the court ruled that an absolute right of access to counsel during an "inherently coercive" custodial interrogation is "indispensable" to protection of the *Fifth* Amendment privilege against self-incrimination. (384 U.S. at pp. 468-469 [16 L.Ed.2d at p. 720].) *Miranda* reasoned that the lawyer's presence reinforces for the accused his right to silence in a way that formalistic warnings by adversary interrogators cannot. (*Id.,* at p. 470 [16 L.Ed.2d at p. 721].) It assures him informed advice on whether to waive or exercise the privilege of silence.

(See *Fare* v. *Michael C.* (1979) 442 U.S. 707, 719 [61 L.Ed.2d 197, 208, 99 S.Ct. 2560], rehg. den., 444 U.S. 887 [62 L.Ed.2d 121, 100 S.Ct. 186].) And it minimizes the possibility that any subsequent confession will be involuntary, untrustworthy, or inaccurately reported at trial. (*Miranda, supra,* at p. 470 [16 L.Ed.2d at p. 721], see also *Michael C., supra,* at p. 719 [61 L.Ed.2d at pp. 208-209].)

■ Because of the attorney's "unique" and "critical" role during custodial questioning (*Michael C., supra*), *Miranda* required "fully effective means" of ensuring the suspect's right of access to counsel. The authorities must advise the individual before questioning of the rights to silence and to counsel, appointed if necessary. (384 U.S. at pp. 444, 471-473 [16 L.Ed.2d at pp. 706-707, 721-723].) Even if the suspect expressly waives these rights, as he must before questioning can proceed without counsel, he must be assured "a continuous opportunity" to invoke or reinvoke them.

Thus "[i]f . . . he indicates in any manner and *at any stage of the process* that he wishes to consult with an attorney before speaking there can be no [further] questioning" until a lawyer is provided. (*Id.,* at pp. 444-445 [16 L.Ed.2d at p. 707], italics added; *Edwards* v. *Arizona* (1981) 451 U.S. 477, 484-485 [68 L.Ed.2d 378, 386, 101 S.Ct. 1880], rehg. den., 452 U.S. 973 [69 L.Ed.2d 984, 101 S.Ct. 3128].) "Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." (*Miranda, supra,* at p. 474 [16 L.Ed.2d at p. 723].)

■ No statement obtained during a custodial interrogation is admissible unless the rights to silence and counsel were waived "voluntarily, knowingly, and intelligently." (*Id.,* at p. 444 [16 L.Ed.2d at p. 707]; see *Escobedo, supra,* 378 U.S. at p. 490, fn. 14 [12 L.Ed.2d at p. 986]; *Johnson* v. *Zerbst* (1938) 304 U.S. 458, 464 [82 L.Ed. 1461, 1466, 58 S.Ct. 1019, 146 A.L.R. 357].) The basic *Miranda* warnings are an absolute prerequisite to a voluntary, knowing, and intelligent waiver in most cases, but they are not necessarily sufficient. As *Miranda* noted, "*any* evidence that the accused was threatened, *tricked,* or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." (384 U.S. at p. 476 [16 L.Ed.2d at p. 725], italics added.)

An additional comment in *Miranda* also bears directly on the issue before us. Analyzing the importance of counsel's presence to help "dispel the compelling atmosphere of [a custodial] interrogation," the *Miranda* majority recalled that the police in *Escobedo* had actually "heightened [the suspect's] dilemma" by denying his express requests for counsel. Moreover, the court observed, "[t]he police *also* prevented the attorney [in *Escobedo*] from

consulting with his client. Independent of any other constitutional proscription, this action constitutes a violation of the Sixth Amendment right to the assistance of counsel and excludes any statement obtained in its wake. [Citation.]" (*Miranda, supra,* 384 U.S. at pp. 465-466, fn. 35 [16 L.Ed.2d at pp. 718-719], italics added.)[5]

Applying these principles, at least 12 state courts and 1 United States Court of Appeals panel have concluded at a minimum that when law enforcement officers thwart a suspect's access to an attorney whom they know is legitimately attempting to consult with him, the suspect's waiver of counsel is void, and his subsequent statements are inadmissible.

Even before *Escobedo,* the New York Court of Appeals, applying a *Miranda*-like analysis, had concluded as a matter of state law that the police may not prevent a lawyer retained by family or friends from consulting with a suspect under interrogation. (*People* v. *Donovan* (1963) 13 N.Y.2d 148 [193 N.E.2d 628, 629].) *Donovan* was cited with apparent approval in *Escobedo.* (378 U.S. at pp. 486-487 [12 L.Ed.2d at pp. 983-984].) After *Miranda,* the New York courts ruled that its protections, and those provided by *Donovan, supra,* could only be implemented if, "[o]nce an attorney enters the proceeding," the suspect is permitted to reconsider his waiver *in counsel's presence.* (*People* v. *Hobson* (1976) 39 N.Y.2d 479 [348 N.E.2d 894, 897]; *People* v. *Arthur* (1968) 22 N.Y.2d 325 [239 N.E.2d 537, 539].)

Other courts have not adopted New York's later rule that the suspect *must* consult with any lawyer who seeks to enter the case. However, the great preponderance agree that, even after a *Miranda* waiver, the suspect's continuing right to the assistance of retained or appointed counsel, *if he so desires,* prevents the authorities, who are responsible for his isolation, from employing tactics intended to interfere with the attorney-client relationship. (*Burbine* v. *Moran* (1st Cir. 1985) 753 F.2d 178, 187;[6] *Lodowski* v. *State* (1985) 302 Md. 691 [490 A.2d 1228, 1237-1244];[7] *Elfadl* v. *State* (1985)

---

[5]Two years later, citing footnote 35, the court again condemned the police practice of interrogating a suspect in isolation from attorneys who were attempting to consult with him. In *Darwin* v. *Connecticut* (1968) 391 U.S. 346 [20 L.Ed.2d 630, 88 S.Ct. 1488], the court concluded that a confession obtained before the decision in *Escobedo* and *Miranda* had been coerced. It noted that the suspect had been held incommunicado for 30 to 48 hours before he made the inculpatory statements; the court particularly emphasized that "[t]he denial of access to counsel and the outside world continued throughout," though "petitioner's lawyers made numerous attempts to communicate with petitioner or with the officer in charge. (Cf., *Escobedo* . . ., *Miranda* . . ., *supra,* at 465, n. 35.) . . ." (P. 349 [20 L.Ed.2d at p. 633].)

[6]The United States Supreme Court granted certiorari in *Burbine* and has recently reversed the court of appeals's decision. The Supreme Court opinions in *Burbine* are discussed in greater detail below.

[7]*Lodowski,* decided on federal grounds, was vacated by the United States Supreme Court and remanded for consideration in light of *Burbine.* (*Maryland* v. *Lodowski* (1986) — U.S. — [89 L.Ed.2d 711, 106 S.Ct. 1452], on remand *Lodowski* v. *State* (1986) 307 Md. 233 [513 A.2d 299].)

61 Md.App. 132 [485 A.2d 275, 280], cert. den. (1986) — U.S. — [89 L.Ed.2d 715, 106 S.Ct. 1457]; *Haliburton* v. *State* (Fla. 1985) 476 So.2d 192, 193-194; *Lewis* v. *State* (Okla.Crim.App. 1984) 695 P.2d 528, 530; *Weber* v. *State* (Del. 1983) 457 A.2d 674, 685-687; *People* v. *Smith* (1982) 93 Ill.2d 179 [442 N.E.2d 1325, 1329], cert. den. (1983) 461 U.S. 937 [77 L.Ed.2d 312, 103 S.Ct. 2107]; *State* v. *Matthews* (La. 1982) 408 So.2d 1274, 1278;[8] *State* v. *Haynes* (1979) 288 Ore. 59 [602 P.2d 272, 278], cert. den. (1980) 446 U.S. 945 [64 L.Ed.2d 802, 100 S.Ct. 2175]; *State* v. *Jones* (1978) 19 Wn.App. 850 [578 P.2d 71, 73]; *Davis* v. *State* (Fla.App. 1973) 287 So.2d 399, 400; *Commonwealth* v. *McKenna* (1969) 355 Mass. 313 [244 N.E.2d 560, 566];[9] see also *Commonwealth* v. *Hilliard* (1977) 471 Pa. 318 [370 A.2d 322, 324] [pl. opn.].)

The decisions invoke both *Miranda* and the independent right to assistance of counsel as rationales for their results. A frequent theme is that, by withholding information "vital" to the suspect's decision whether to seek counsel's advice, the authorities have ensured that his *Miranda* waiver is not knowing and intelligent. (E.g., *Weber, supra,* at p. 685; *Smith, supra,* at p. 1329; *Matthews, supra,* at p. 1278; *Jones, supra,* at p. 73; see particularly *Haynes, supra,* at p. 278.[10])

At the least, these decisions recognize that where the police mislead or bar the suspect's attorney, while keeping the suspect ignorant that he has available counsel, they engage in an unconscionable evasion of his absolute right to consult with his available lawyer. (See, e.g., *Burbine* v. *Moran, supra,* 753 F.2d at p. 187 ["deliberate or reckless misleading of an attorney . . . combined with a police failure" to inform the suspect]; *Haynes, supra,* at pp. 278-279 ["police interference with consultations between defendant and an attorney 'constitutes a violation of the [constitutional] right to the assistance of counsel . . .'" (quoting *Miranda, supra,* at fn. 35)]; *Jones, supra,* at pp. 72-73 [condemning "custodial interrogation . . . in planned absence of counsel" and holding that retained lawyer cannot be denied reasonable access to client]; *McKenna, supra,* at pp. 566-567 [suspect's "'implied waiver' of his right to counsel did not survive the refusal of the

---

[8]See also *State* v. *Jackson* (La. 1974) 303 So.2d 734, 736-737.)

[9]See also *Com.* v. *Sherman* (1983) 389 Mass. 287 [450 N.E.2d 566, 570-571]; *Commonwealth* v. *Mahnke* (1975) 368 Mass. 662 [335 N.E.2d 660, 678], cert. den. (1976) 425 U.S. 959 [48 L.Ed.2d 204, 96 S.Ct. 1740]; compare *Com.* v. *Bradshaw* (1982) 385 Mass. 244 [431 N.E.2d 880, 893]; *Com.* v. *Hooks* (1978) 375 Mass. 284 [376 N.E.2d 857, 864].

[10]"To pass up an abstract offer to call some unknown lawyer is very different from refusing to talk with an identified attorney actually available to provide at least initial assistance and advice. . . . A suspect indifferent to the first offer may well react quite differently to the second."

police to admit counsel to him or . . . to inform him that counsel were present"].)[11]

In *Moran* v. *Burbine* (1986) 475 U.S. 412 [89 L.Ed.2d 410, 106 S.Ct. 1135], a majority of the United States Supreme Court has rejected the predominant lower-court view. There, an assistant public defender, Ms. Munson, was retained by the sister of a suspect taken into custody late the same afternoon on suspicion of burglary. Munson immediately telephoned the police station, and a male voice answered "Detectives." Munson announced that she represented the suspect, Burbine, and wished to speak to him before any questioning. She was told the police were "through with" Burbine for the day. Lulled by this representation, Munson did not go to the station. Meanwhile, the police read Burbine his *Miranda* rights but did not tell him that counsel had been retained or had attempted to reach him. After a *Miranda* waiver was obtained, interrogation began. During the evening, Burbine confessed to a murder.

A divided Rhode Island Supreme Court affirmed Burbine's conviction, holding that the police had no duty under *Miranda* to advise him of counsel's availability or to honor Munson's request for access. Moreover, the court concluded, there was no convincing evidence of a purposeful, collusive attempt to deceive Munson. (*State* v. *Burbine, supra,* 451 A.2d at pp. 29-30.) The United States District Court denied Burbine's petition for habeas corpus, but the First Circuit Court of Appeals reversed. The appeals court reasoned that the police had deprived Burbine of information "crucial" to his decision whether to consult counsel. By keeping Burbine in ignorance, and by their "blameworthy" misrepresentation to Munson, the police had undermined any claim that Burbine's *Miranda* waiver was knowing and voluntary. (*Burbine* v. *Moran, supra,* 753 F.2d at pp. 184-187.)

The Supreme Court granted certiorari and reversed the court of appeals. In a six-to-three decision, it held that federal law is satisfied when a suspect in preindictment custody understands and voluntarily waives his rights to remain silent, to prevent or stop questioning, and to consult counsel before and during questioning. Unless the suspect requests counsel, the police need

---

[11]A smaller number of cases from other jurisdictions have concluded that the police violated no rights to counsel when they failed to assist a lawyer's efforts to locate a suspect under interrogation or to advise the suspect of the attorney's inquiries. (*Fuentes* v. *Moran* (1st Cir. 1984) 733 F.2d 176, 179-181; *Hance* v. *Zant* (11th Cir. 1983) 696 F.2d 940, 947, cert. den., 463 U.S. 1210 [77 L.Ed.2d 1393, 103 S.Ct. 3544]; *State* v. *Burbine* (R.I. 1982) 451 A.2d 22, 28, vacated on this issue, *Burbine* v. *Moran, supra,* 753 F.2d 178, 187; *Blanks* v. *State* (1985) 254 Ga. 420 [330 S.E.2d 575, 579]; *State* v. *Beck* (Mo. 1985) 687 S.W.2d 155, 158-159; *State* v. *Blanford* (Iowa 1981) 306 N.W.2d 93, 96; *State* v. *Chase* (1978) 55 Ohio St.2d 237 [378 N.E.2d 1064, 1070].)

not inform him that a lawyer has been retained for him, nor need they allow the lawyer access to a suspect who has not asked for assistance.

Justice O'Connor's majority opinion reasoned that a suspect's mere ignorance of events outside the interrogation room cannot influence or vitiate his voluntary decision to forego counsel and answer questions, so long as he is not coerced and fully comprehends the information included in the *Miranda* warning. The majority acknowledged that the police may act unethically when they withhold information from the suspect or interfere with counsel's attempts at communication. However, it concluded, such misconduct is not the kind of "trick[ery]" which *Miranda* condemned as fatal to a valid waiver. (475 U.S. at p. — [89 L.Ed.2d at p. 423].) *Miranda*'s "subtle balance" between the interests of law enforcement and the suspect's Fifth Amendment rights against self-incrimination would be undone, said Justice O'Connor, if the police were required to delay or interrupt questioning so that a suspect who had waived his *Miranda* rights could decide whether to speak with a lawyer retained for him by others. (*Id.*, at p. — [89 L.Ed.2d at p. 424].)

The majority also expressly rejected the claim that the independent Sixth Amendment right to counsel precludes police interference with the relationship between a *retained* lawyer and his client in custody. The court reasoned as follows: Despite some contrary implications in *Escobedo* and *Miranda*, it is now settled that the *Escobedo-Miranda* rule rests solely on Fifth Amendment principles; Sixth Amendment rights attach only upon the filing of formal criminal charges. This is so regardless of whether counsel is retained or appointed. The Sixth Amendment right is to the assistance of *a lawyer* in adversary criminal proceedings. It does not depend on the "fortuity" that counsel has been retained, nor does it protect a particular attorney-client relationship prior to formal charging. (*Id.*, at pp. —— [89 L.Ed.2d at pp. 425-428].)[12]

Finally, the majority concluded, no federal due process violation had occurred on the facts before the court. Even if the police had deceived Burbine's lawyer to prevent her from reaching him before questioning, their conduct was not so egregious as to "[shock] the sensibilities of civilized society [and] warrant a federal intrusion into the criminal processes of the States." (*Id.*, at pp. —— [89 L.Ed.2d at pp. 428-429].)

In a searing and scholarly dissent, Justices Stevens, Brennan, and Marshall took sharp issue with each of the majority's premises. First, the dissent

---

[12]The majority specifically disclaimed a broad reading of language in *Escobedo* and *Miranda* which suggested that interference with an attorney's attempts to reach his client necessarily violates the client's constitutional rights. The *Burbine* majority noted that in *Escobedo*, cited in turn by *Miranda*, the suspect had requested counsel.

noted, *Miranda* had sprung from the traditional Anglo-American recognition that incommunicado police interrogation is inherently coercive. For this reason, the government bears a heavy burden in showing that a suspect held for questioning by the authorities has waived his rights to silence and counsel voluntarily, and with full comprehension of the consequences. *Miranda* itself acknowledged that the warning it requires is essential to a valid waiver but may not be enough. Under *Miranda*, "[t]rick[ery]" or "cajol[ery]" by the police vitiate the requirements of voluntariness and full comprehension, even where the suspect heard a *Miranda* warning and purported to waive his rights. There is no principled basis, the dissent urged, for distinguishing between police *lies* and police *omissions*, to the extent both bear critically on the wisdom of a decision to waive counsel. (*Id.*, at pp. ——— [89 L.Ed.2d at pp. 441-443].)

Second, the dissent observed, the majority's "balancing of interests" analysis was flawed. Any rule, such as *Miranda*, which gives effect to the suspect's right to choose counsel carries the risk that the lawyer, once chosen, will persuade him not to talk. Yet we do not deny crucial rights and protections for fear that they will be used. The majority, said the dissent, saw a compelling state interest in the very sort of lawyer-free "incommunicado interrogation" which *Miranda* deemed suspect. (*Id.*, at pp. ——— [89 L.Ed.2d at pp. 444-446].)

Third, the dissent argued, the majority had overstated the case in suggesting that *Miranda* was intended as a final clarification of the limits on custodial interrogation. On the contrary, wrote Justice Stevens, that decision sought to clarify a *suspect's minimum rights* in police custody and to assist courts in determining the voluntariness of confessions. The majority's conclusions represented a retreat from these minimum standards. (*Id.*, at pp. ——— [89 L.Ed.2d at pp. 446-447].)

Fourth, the police efforts to mislead counsel in order to prevent communication with her client were tantamount to a deception of the client himself. They abrogated his undisputed right, under either the Fifth or Sixth Amendment, to have access to a lawyer already retained. (*Id.*, at pp. ——— [89 L.Ed.2d at pp. 447-449].)

Finally, the dissent asserted, "police interference in the attorney-client relationship is the type of governmental misconduct on a matter of central importance to the administration of justice that the Due Process Clause prohibits. . . ." As the police cannot lie to a suspect or conceal exculpatory evidence, "so [they] cannot conceal from [him] the material fact of his attorney's communication." Such conduct "violates the due process re-

quirement of fundamental fairness." (*Id.,* at pp. —— [89 L.Ed.2d at pp. 450-451].)

"This case," the dissent concluded, "turns on a proper appraisal of the role of the lawyer in our society. If a lawyer is seen as a nettlesome obstacle to the pursuit of wrongdoers—as in an inquisitorial society—then the Court's decision today makes a good deal of sense. If a lawyer is seen as an aid to the understanding and protection of constitutional rights—as in an accusatorial society—then today's decision makes no sense at all." (*Id.,* at p. —— [89 L.Ed.2d at p. 451].)

By its terms, *Burbine* leaves the states free to "[adopt] different requirements for the conduct of [their] employees and officials as a matter of state law. . . ." (*Id.,* at p. — [89 L.Ed.2d at p. 425].) ▮ It is settled beyond debate, of course, that our state Constitution is "a document of independent force" (*People* v. *Brisendine* (1975) 13 Cal.3d 528, 549-550 [119 Cal.Rptr. 315, 531 P.2d 1099]); unless a contrary intent is apparent, its guarantees "are not dependent on those [provided] by the United States Constitution." (Cal. Const., art. I, § 24.)

▮ We sit as a court of last resort on the meaning of California's Declaration of Rights. Our decisions cannot limit federal guarantees, but restrictive federal interpretations of the United States Constitution do not preclude a finding that the Constitution of our state accords its citizens greater individual rights. (*Pettingill, supra,* 21 Cal.3d at p. 248.) Indeed, in the federal system, state charters offer important local protection against the ebbs and flows of federal constitutional interpretation. (*Bustamante, supra,* 30 Cal.3d at p. 97; see, e.g., Mosk, *The State Courts,* in American Law: The Third Century (Schwartz edit.) 213, 217-220.)[13]

We do not depart lightly from clear United States Supreme Court rulings. The high court's decisions defining fundamental rights and liberties are

---

[13]The debates at the constitutional convention of 1849 make quite clear that the language of the Declaration of Rights which comprises article I of the California Constitution was not based upon the federal charter at all, but upon the constitutions of other states. (Reports of the Debates in the Convention of Cal. on the Formation of the State Const. (hereafter 1849 Debates), Sept. 7, 1849, at p. 31.) When the 1849 Constitution was adopted, of course, the Fourteenth Amendment to the federal Constitution, by which certain federal constitutional rights have been applied to the states, did not yet exist. Indeed, a reading of *both* the 1849 and 1878 constitutional debates reflects a common understanding that it was the *state* Constitution, and not the federal, which would protect the rights of California citizens against arbitrary action by the state. (See Debates & Proceedings, Cal. Const. Convention 1878-1879, p. 240; 1849 Debates, Sept. 7-8, 1849, at pp. 30-42.) Thus, we cannot accept Justice Lucas's suggestion that state courts should generally adhere to federal precedent when interpreting *state* constitutions unless, in his ambiguous phrase, there is "some greater showing of an independent state interest needing additional protection. [Fn. omitted.]" (*Post,* at p. 624.)

entitled to "respectful consideration." But they are to be followed in California "only where they provide no less individual protection than is guaranteed by California law." (*People* v. *Longwill* (1975) 14 Cal.3d 943, 951, fn. 4 [123 Cal.Rptr. 297, 538 P.2d 753].) In appropriate cases, we have forthrightly rejected adherence to United States Supreme Court precedent (see fn. 2, *ante*), even where it was necessary to overrule our own prior decision adopting the federal rule. (*Disbrow, supra,* 16 Cal.3d at p. 106 et seq.)

 Applying these principles, we find ourselves unpersuaded by the majority opinion in *Burbine*. For purposes of the California Constitution, we adhere in general to the reasoning adopted by the *Burbine* dissent, the American Bar Association (ABA),[14] and the overwhelming majority of state courts which have addressed the issue. We therefore hold that, whether or not a suspect in custody has previously waived his rights to silence and counsel, the police may not deny him the opportunity, before questioning begins or resumes, to meet with his retained or appointed counsel who has taken diligent steps to come to his aid.

If the lawyer comes to the station before interrogation begins or while it is still in progress, the suspect must promptly be told, and if he then wishes to see his counsel, he must be allowed to do so. Moreover, the police may not engage in conduct, intentional or grossly negligent, which is calculated to mislead, delay, or dissuade counsel in his efforts to reach his client. , Such conduct constitutes a denial of a California suspect's *Miranda* rights to counsel, and his independent right to assistance of counsel,[15] and it invalidates any subsequent statements.[16]

---

[14]Standard 5-7.1 of the ABA Standards for Criminal Justice (2d ed. 1980) urges that a person in custody "be effectively placed in communication with a lawyer" at the earliest opportunity. To this end, it suggests, the police should furnish the suspect with access to a telephone, the telephone number of available counsel, "and any other means necessary to establish communication with a lawyer." The ABA filed an extensive amicus brief in *Burbine*. The brief expressed the ABA's "deep concern" that if the police can prevent communication between a lawyer and a suspect in isolation, "an important right to legal representation will be lost . . . ." (See dis. opn. of Stevens, J., 475 U.S. at p. —, fn. 14 [89 L.Ed.2d at p. 434].)

[15]In *Bustamante, supra,* we affirmed, contrary to *Kirby* v. *Illinois* (1972) 406 U.S. 682 [32 L.Ed.2d 411, 92 S.Ct. 1877], that there is a state constitutional right to counsel at a lineup which occurs before formal criminal proceedings are begun. We adopted the premise initially expressed in *Escobedo* and *Dorado* that events which occur before formal charging can nonetheless be "critical stages" of the prosecution. (*Bustamante, supra,* 30 Cal.3d at pp. 98-102.) As those early decisions establish, an accusatory custodial interrogation is such a "critical stage," and we adopt that rule for purposes of the California Constitution.

[16]In so holding, we do not contravene the result in *People* v. *Saidi-Tabatabai* (1970) 7 Cal.App.3d 981 [86 Cal.Rptr. 866]. There the court found no obligation to cease questioning when the suspect's counsel, who had reason to know the suspect was being interrogated, made only a telephone inquiry, did not ask that questioning be stopped, and never came to

In the main, Justice Lucas's dissent is an able statement of the United States Supreme Court majority's reasoning in *Burbine*. We recognize, as did the *Burbine* dissent, that the issue in this case forces a choice between two irreconcilable views of a suspect's rights to counsel and against self-incrimination. The pros and cons of each have been set forth at length; for the most part, we need not rehash them in the context of Justice Lucas's opinion.

Certain of the dissent's observations, however, deserve comment. The dissent urges that our ruling is unworkable since, even if a lawyer presents himself in person at the station, the police have only his word that he is an attorney with authority to represent the suspect. That hardly seems an insurmountable problem. A member of the State Bar is issued a card which identifies him as such, and any misrepresentation by an attorney is subject to discipline. (See Bus. & Prof. Code, §§ 6104, 6106.) █ Like the First Circuit, we foresee "no real danger of an influx of volunteering attorneys with no past or present relationship to the client. . . ." (*Burbine* v. *Moran, supra,* 753 F.2d at p. 187.)[17]

The dissent suggests that our holding is somehow "unfair"—apparently because it denies "equal protection" to unrepresented suspects. He posits that our rule will benefit only affluent, sophisticated defendants whose retained counsel happen to arrive at the station soon enough to prevent inculpatory statements. (See also Kamisar, *Brewer v. Williams, Massiah, and Miranda: What is "Interrogation"? When Does It Matter?,* in Police Interrogation and Confessions (Kamisar edit. 1980) pp. 139, 220-221.)

---

the station. There was no indication the authorities had misled the lawyer. Presiding Justice Kaus, writing for the majority, noted that the police had no means of verifying whether the "voice on the telephone" was actually the suspect's lawyer. (P. 985.)

Nor is our ruling inconsistent with *People* v. *Gott* (1981) 117 Cal.App.3d 125 [173 Cal.Rptr. 469]. *Gott* held only that the police need not tell a suspect who has waived counsel that an *unappointed* public defender seeks to consult with him. (Pp. 128-130; distinguishing *In re Brindle* (1979) 91 Cal.App.3d 660, 678-681 [154 Cal.Rptr. 563] [police cannot prevent public defender, though not yet appointed, from exercising his legal and ethical responsibility to make himself immediately available to a suspect who requests his assistance].)

[17]The majority of lower-court decisions have assumed, correctly we think, that the attorney-client relationship is established for these purposes even when the lawyer has been retained by third parties not in custody, rather than by the suspect himself. Indeed, this is the reality in many cases where an attorney "enters the picture." A suspect without prior criminal experience or a preexisting attorney-client relationship is unlikely to be able, in police detention, to actually implement his right to retain counsel. Nor, for these purposes, should relatives alone have the power to seek a lawyer's help. (But cf., Pen. Code, § 825 [$500 damages to a prisoner prevented access to an attorney who seeks to visit with the prisoner "at the request of the prisoner or any relative of such prisoner . . ."].) We find nothing in either the ABA's Model Code of Professional Responsibility or in the Rules of Professional Conduct adopted by the State Bar of California which precludes an attorney from intervening at the request of family or friends. (See generally, ABA Code Prof. Responsibility (1979) DR 2-103, 2-104; Rules Prof. Conduct, rule 2-101.)

We fail to see, however, how an individual enmeshed in custodial inter-rogation can be kept from his own lawyer, retained or appointed, simply because other suspects under questioning do not yet have attorneys. The doctrine of equal protection is society's shield against discriminatory treat-ment by the authorities. It is not a sword with which the authorities may deprive the accused of his counsel's assistance.[18]

At bottom, the dissent accuses us of "bad policy" in formulating a rule which is impractical, open to abuse, and "unfair" both to law enforcement and to unrepresented suspects. But a contrary result would encourage the police to emasculate *Miranda* and the constitutional right to counsel. Cal-ifornia law enforcement agents would not fail to comprehend that, once a formally correct *Miranda* waiver had been obtained, they were free to interrogate a suspect in isolation, taking any necessary steps to prevent him from having contact with his own lawyer. To conclude that vital rights can be so easily denied would be "bad policy" of the most basic kind.[19]

Finally, we do not accept the premise that defendant's statements should be admissible if the "totality of circumstances" suggests he would have declined his lawyer's offer of assistance. When the suspect has the right to assistance of counsel, direct denial of that right always invalidates a subsequent confession, whether or not there is evidence that the suspect would have availed himself of its benefits. (See, e.g., *Massiah, supra,* 377 U.S. at p. 207 [12 L.Ed.2d at p. 251]; *Dorado, supra,* 62 Cal.2d at pp. 353-354.) Moreover, as *Miranda* suggested, "any" evidence of police deception to induce a waiver of counsel will vitiate the waiver. (384 U.S. at p. 476 [16 L.Ed.2d at p. 725].) The same must be said for deception designed to prevent revocation of the waiver. "When the opportunity to consult counsel is in fact frustrated, there is no room for speculation what defendant might

---

[18]The Supreme Court majority in *Burbine* made passing reference to a similar disparity; the dissent responded by noting that the premise fails to regard *Miranda*'s purpose of *deterring police misconduct*. No such misconduct occurs, of course, when the police fail to advise an unrepresented suspect that he has counsel. (*Burbine, supra,* 475 U.S. at p. —, fn. 39 [89 L.Ed.2d at p. 442] [dis. opn. of Stevens, J.].)

[19]The dissent reminds us that the police have no obligation to provide a suspect with all information which might be "useful" to him in deciding whether to waive counsel or answer questions. (See, e.g., *Oregon* v. *Elstad* (1985) 470 U.S. 298, 317 [84 L.Ed.2d 222, 237, 105 S.Ct. 1285] [information about nature and quality of evidence not required]; *United States* v. *Washington* (1977) 431 U.S. 181, 188-189 [52 L.Ed.2d 238, 246, 97 S.Ct. 1814] [no requirement of warning about possible "target" status as prerequisite to noncustodial questioning before grand jury].) However, as the *Burbine* dissent noted, "the police action at issue here is not simply a failure to provide 'useful' information; rather, it is affirmative police interference in a communication between an attorney and a suspect. Moreover, the 'information' [withheld] by the police bears directly on the right to counsel that police are asking the suspect to waive. . . ." (475 U.S. at p. —, fn. 42 [89 L.Ed.2d at p. 443].)

or might not have chosen to do after he had that opportunity." (*Haynes, supra,* 602 P.2d at p. 280.)

We apply these principles to the facts at hand. Attorney Gowdy, retained by defendant's friends, immediately called the station to ask that questioning cease until he could consult with his client. According to his testimony, he spoke to one of the interrogating officers, who claimed not to know whether defendant was at the station but promised to tell defendant of counsel's entry into the case. Neither of these representations was true. Nonetheless, Gowdy came directly to the station, where he was denied access to defendant. Defendant was never told of Gowdy's presence. This course of conduct by the police directly thwarted defendant's right of access to his counsel, who had taken every diligent step to assist him.

The trial court employed the reasonable-doubt standard to determine whether defendant had completed his inculpatory statement before the police embarked on the conduct here condemned. We conclude it did so correctly. Because of the importance of ensuring that coerced confessions are not admitted, and because of the tendency, under a preponderance-of-evidence standard, to accept the authorities' self-serving account of events over the suspect's, we have ruled that the reasonable doubt standard applies to the determination whether a confession was voluntary. (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 602-608 [147 Cal.Rptr. 172, 580 P.2d 672]; see also *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 753 [175 Cal.Rptr. 738, 631 P.2d 446], cert. den. (1982) 455 U.S. 922 [71 L.Ed.2d 464, 102 S.Ct. 1280].) We think similar principles bear on a finding whether a confession was obtained in violation of the right to counsel.[20]

The court below found it could not say beyond a reasonable doubt that defendant's interrogation had ceased before Attorney Gowdy arrived at the Walnut Creek station. We cannot upset this finding of fact unless it is palpably erroneous. (See *In re Eric J.* (1979) 25 Cal.3d 522, 527 [159 Cal.Rptr. 317, 601 P.2d 549].) The most the record discloses with certainty is that the questioning was complete by about 9:20 p.m., when defendant made his first "set-up" call to his alleged supplier. Agent Williams, the principal interrogator, testified that he first saw defendant within a few minutes after the 8 p.m. arrest, and that "[f]rom the time I saw him until the time I completed [was] . . . I would say approximately total, 30, 35 minutes." But defendant's testimony suggests that the

[20]Since the alleged crime and confession occurred in 1980, we need not decide whether Proposition 8 precludes application of the California standard of proof even if it differs from that provided by federal law. (See *Smith, supra,* 34 Cal.3d at pp. 262-263; cf., *Lego* v. *Twomey* (1972) 404 U.S. 477 at pp. 488-489 [30 L.Ed.2d 618 at p. 627, 92 S.Ct. 619].)

interview may not have begun until around 8:30, after which there was a further delay while Williams arranged for a search of defendant's house pursuant to his consent. Gowdy arrived at 9 p.m. and was told he could not see defendant *because they were "still talking" to him.* Defendant testified he did see Gowdy *after* the questioning but *before* he made the telephone calls.

Thus, the People have failed to show beyond a reasonable doubt that questioning was complete before Gowdy's arrival. His confession was therefore inadmissible, and his conviction must be overturned. Our analysis makes it unnecessary to address defendant's remaining contentions.

The judgment is reversed.

Mosk, J., and Reynoso, J., concurred.

**BIRD, C. J.—** ██ ██ I concur in the majority opinion with one significant caveat. I do not agree that a suspect's right to communicate with his lawyer should depend on whether that lawyer arrives at the police station before the police questioning of the client begins. I cannot believe that a suspect's right to counsel (Cal. Const., art. I, § 15) was intended to depend on the vagaries of traffic jams, road or weather conditions, or an attorney's busy schedule.

The majority adhere correctly, I believe, to the reasoning of Justice Stevens' dissenting opinion in *Moran* v. *Burbine* (1986) 475 U.S. 412 [89 L.Ed.2d 410, 106 S.Ct. 1135] in interpreting our state Constitution. (Maj. opn., *ante,* at p. 610.) They hold that if the suspect's attorney is physically present at the police station, the police have an absolute duty to inform the suspect that his attorney wishes to speak with him. However, the majority also hold that the police may conceal from a suspect the critical fact that his attorney is trying to reach him if the attorney is not *physically present* at the station. I find this latter position logically inconsistent, fundamentally unfair, and unjustified by any legal or practical considerations. The dissenters in *Moran* wisely rejected it, and so do I.

The majority opinion properly recognizes the importance of the right to assistance of counsel under the California Constitution. (Maj. opn., *ante,* at pp. 600, 602-605, 610.) The majority also recognize that to allow law enforcement agents "to prevent [a suspect] from having contact with his own lawyer . . . would be 'bad policy' of the most basic kind." (*Id.,* at p. 612.) Given these premises, I cannot understand how my colleagues condone police interference with attorney-client communications when such communications are attempted by means other than personal and physical contact.

My colleagues offer no basis for distinguishing between an attorney's on-the-scene efforts to contact his client and efforts pursued through other means. A suspect has a right to know that his attorney wishes to see him whether that request comes over the police station counter, over the telephone, or via messenger.

In *Moran,* Justice Stevens found "interference with communications between an attorney and [her] client . . ." to be unconstitutional when the defendant "was not told that his attorney had *phoned* and that she had been informed that he would not be questioned." (475 U.S. at p. — [89 L.Ed.2d at p. 451, 106 S.Ct. at p. 1166], italics added; see maj. opn., *ante,* at p. 606.) "[T]he concealment by the police of the critical fact that an attorney retained by the accused or his family has offered assistance, either *by telephone* or in person," Justice Stevens reasoned, renders a suspect's waiver of his right to counsel invalid and "violates the due process requirement of fundamental fairness." (*Moran, supra,* 475 U.S. at pp. —, — [89 L.Ed.2d at pp. 441, 443-444, 451, 106 S.Ct. at pp. 1158, 1160, 1166], italics added.) I agree.

If, indeed, the majority's goal is to discourage police "interfere[nce] with the attorney-client relationship" and to deter "conduct . . . which is calculated to . . . delay . . . counsel in his efforts to reach his client" (maj. opn., *ante,* at pp. 604, 605) a message from an attorney to a client in police custody should be relayed.

Yet, the majority's "physical presence" limitation will permit the police to thwart such communications. A call from a lawyer that he is "on the way" or will be there in a few hours may motivate police to hasten questioning of the suspect so that they will complete it before the attorney arrives. In similar contexts, this court has found the prevention of such abuses to be a legitimate basis for judicially created rules. (See *People* v. *Bustamante* (1981) 30 Cal.3d 88, 101 [177 Cal.Rptr. 576, 634 P.2d 927]; *People* v. *Fowler* (1969) 1 Cal.3d 335, 344 [82 Cal.Rptr. 363, 461 P.2d 643].)

The majority's holding is also fundamentally unfair. Under their rule, a suspect's right to know that his lawyer wants to speak with him will turn upon such irrelevant factors as the attorney's schedule, distance from the police station, or entanglement in traffic jams or battles with foul weather. Furthermore, as Justice Lucas's dissent points out, the majority's rule will favor wealthy or sophisticated suspects whose retained counsel happen to arrive at the station before their clients make incriminating statements. (Dis. opn., *post,* at pp. 621-622.)[1]

---

[1]Despite the soundness of Justice Lucas's reasoning, I do not concur in his ultimate conclusion that police may grant all suspects only such rights as the least fortunate suspects may enjoy.

The majority do not deny that their rule will yield these unfair results. (Maj. opn., *ante,* at p. 612.) Yet, they offer no explanation to justify their solution.[2]

It is commendable that my colleagues attempt to create a "bright line" rule to ensure that a suspect's attorney has taken "diligent steps" to come to his aid. (Maj. opn., *ante,* at p. 610.) However, an attorney's diligence can manifest itself in ways other than showing up at the police station. In many situations, a phone call or messenger may well be the most efficient, effective—and most diligent—means of transmitting a message to a client. This is true, for example, when an attorney is (1) engaged in trial, (2) handling an urgent matter for another client, (3) located far from where the suspect is being detained, or (4) delayed by traffic or weather conditions. It is unreasonable to suggest that failing to appear in person indicates a lack of diligence on the attorney's part.

Practical considerations similarly do not require the adoption of a "physical-presence" requirement. The majority apparently believe that requiring the attorney's physical presence is the only method of verifying that the request emanates from an attorney. (See maj. opn., *ante,* at p. 611.) Admittedly, such verification will not be immediately possible if the attorney does not come to the station. However, this minor problem is not sufficient to justify the distinction which my colleagues have created between on-the-scene efforts and other forms of attempted communication with a client.

The state constitutional right to counsel requires that police relay a message—however received—that the suspect's attorney wishes to speak with him. If upon receiving that message the suspect indicates his desire to speak with counsel, questioning must cease. The police may still insist that the attorney come to the station before the attorney may *speak* with the suspect. When the attorney arrives, his or her status may be verified.[3]

---

[2]The majority refute Justice Lucas's argument (fn. 1, *ante*) by noting simply that the state cannot use equal protection principles as a "sword" to deny all persons certain rights simply because others cannot enjoy them. (Maj. opn., *ante,* at p. 612.) I agree.

My colleagues assert that "[t]he doctrine of equal protection is *society's shield* against discriminatory treatment by the authorities." (*Ibid.,* italics added.) Yet, ironically, they find that their "physical-presence" rule does not violate this principle, even though it permits the authorities to *deny* constitutional protections to some suspects—but not others—solely on the basis of arbitrary distinctions. Thus, the majority's rule does not conform to the very principle they espouse.

[3]Obviously, I differ with my colleagues as to the soundness of the reasoning in *People* v. *Saidi-Tabatabai* (1970) 7 Cal.App.3d 981, 984-985 [86 Cal.Rptr. 866]. (See maj. opn., *ante,* at p. 610, fn. 16.) It is true that the court there declined to hold that the police, armed with a telephonic expression of interest from a suspect's alleged attorney, should either discontinue interrogation or inform the suspect of the attorney's call. (*Id.,* at pp. 984-985.) However, the court did not need to reach that question, since "[c]ounsel did not ask that

Finally, many of the authorities the majority rely on for their duty-to-inform rule (see maj. opn., *ante,* at pp. 604-605) plainly *reject* a "physical-presence" requirement. In *People* v. *Smith* (1982) 93 Ill.2d 179 [442 N.E.2d 1325, 1329], certiorari denied (1983) 461 U.S. 937 [77 L.Ed.2d 312, 103 S.Ct. 2107], the court required police to transmit a message written by an attorney on her business card to a suspect. In *Commonwealth* v. *McKenna* (1969) 355 Mass. 313 [244 N.E.2d 560, 563, 566] and *State* v. *Haynes* (1979) 288 Ore. 59 [602 P.2d 272, 273-274, 278-279], certiorari denied (1980) 446 U.S. 945 [64 L.Ed.2d 802, 100 S.Ct. 2175], the courts announced a broad rule requiring police to relay an attorney's desire to communicate with the suspect—regardless of the medium through which the request was received. Finally, in *Burbine* v. *Moran* (1st Cir. 1984) 753 F.2d 178, 180, 187, reversed, *Moran* v. *Burbine, supra,* 475 U.S. 412 [89 L.Ed.2d 410, 106 S.Ct. 1135], an attorney's telephonic request to speak to his client was found to trigger a duty on the part of the police to communicate that desire to the suspect.

None of these cases ever suggested that physical presence—or lack thereof—had any bearing on a police officer's duty to relay an attorney's message that he wishes to speak with his client. Indeed, this underscores the fact that my colleagues have created an unsupportable rule which serves no apparent purpose other than to penalize suspects whose attorneys' absence from the station is due wholly to extraneous circumstances.

In sum, the majority is correct in requiring that police refrain from interfering with attorney-client communications. In so holding, this court furthers the state constitutional guarantee to the right to counsel. However, to limit that holding to cases where the attorney is physically present at the police station defies logic, ignores reality and renders that important guarantee a hollow one. This judicially created rule is arbitrary at best. The majority's "physical-presence" rule is a quantum leap beyond acceptable limits. Since that leap is unwarranted, I cannot join my brethren's opinion.

Broussard, J., concurred.

**LUCAS, J.**—I dissent. Rejecting the analysis and clear holding of a recent United States Supreme Court decision directly on point, the majority embarks on its own application and interpretation of federal precedent with barely a nod to the contrary approach taken by the high court in *Moran* v. *Burbine* (1986) 475 U.S. 412 [89 L.Ed.2d 410, 106 S.Ct. 1135]. There,

---

the interrogation cease until he had a chance to confer with his client, nor did he request that defendant be advised that he was representing her." (*Id.,* at p. 984.) All that counsel did was telephone and obtain information as to whether he could bail his client out and whether he would be able to see her if he drove across town to the station. (*Ibid.*)

the United States Supreme Court held that neither Fifth nor Sixth Amendment principles require suppression of confessions obtained after a valid voluntary waiver of *Miranda* rights by a defendant (see *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]), despite the fact that counsel for the defendant unsuccessfully sought access to his or her client during the course of the interrogation.

The majority reiterates the points urged by the *Burbine* dissenters and decides to "adhere in general" to their reasoning rather than to that of the majority. Acknowledging that normally this court does not "depart lightly from clear United States Supreme Court rulings," my colleagues nonetheless determine that this is an "appropriate case" in which to do so. In adopting the arguments urged by the *Burbine* dissent on the ground that this best vindicates Fifth and Sixth Amendment rights "as they apply in California," the majority here of necessity in large part rejects the United States Supreme Court majority's interpretation of its own precedent. (See *ante,* at pp. 607-609 [majority's recitation of *Burbine* dissenters' views].) I find the majority's asserted rationale unpersuasive.

The *Burbine* majority opinion sets forth the principles to which I believe we should adhere. I do not intend to review them here, but I wish to emphasize various points which I believe highlight the weaknesses in the views adopted by my colleagues.

In the present case, defendant was read his *Miranda* rights at least two or, according to some testimony, three times. The first reading was in a car en route to the police station immediately following defendant's arrest. Thereafter, defendant was advised of his rights before interrogation at the police station. At the station, these rights were read to him as follows: "You have the right to remain silent. You do not have to answer my questions or talk to me. Anything you say can and will be used against you in a court of law. *You have the right to talk to a lawyer and have him present with you while you are being questioned.* If you cannot afford to hire a lawyer one will be appointed to represent you *before any questioning if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements.*" In other words, defendant was clearly told he had a right to have counsel present and that he could exercise that right at any time.

Defendant confirmed his understanding of his rights and his desire to waive them. I agree that, as the trial judge found, "beyond a reasonable doubt and to a moral certainty" defendant's subsequent confession was made freely and voluntarily. The invalidity of the confession found by my colleagues rests not upon any initial impropriety in obtaining defendant's

waiver, but rather upon the failure of the police to interrupt interrogation to reiterate defendant's right to counsel and to inform him that an attorney was present who was willing to speak with him. Nothing further occurred *in the interrogation room* which enhanced or altered the "coercive" nature of the police interrogation.

Both federal and state Constitutions use strikingly similar language to provide that criminal defendants shall not be compelled to be witnesses against themselves. (U.S. Const., Amend. V; Cal. Const., art. I, § 15.) In *Miranda,* the court concluded that because custodial interrogations were inherently coercive (384 U.S. at p. 467 [16 L.Ed.2d at p. 719]), if no attorney was present during interrogation, the prosecution bears the "heavy burden" of proving that a defendant's waiver of his rights was knowing and intelligent (*id.* at p. 475 [16 L.Ed.2d at p. 724]).

No precise line divides a voluntary statement from an involuntary one, or a knowing and intelligent waiver from one which is not. Of course, in certain instances all would agree that a statement was involuntary or a waiver was not knowing and intelligent. For example, if the police physically abuse a suspect to elicit a confession, that confession is undoubtedly involuntary, and its admission at trial would violate the Fifth Amendment. Whether a particular *Miranda* waiver is knowing and intelligent, however, must be based upon "'the particular facts and circumstances, surrounding [the] case, including the background, experience, and conduct of the accused.'" (*North Carolina* v. *Butler* (1979) 441 U.S. 369, 374-375 [60 L.Ed.2d 286, 293, 99 S.Ct. 1755], quoting *Johnson* v. *Zerbst* (1938) 304 U.S. 458, 464 [82 L.Ed. 1461, 1466, 58 S.Ct. 1019].)

The United States Supreme Court's test for a knowing and intelligent waiver speaks to *the subjective mental attitude of the suspect* when he is deciding to waive his rights. Thus, if a suspect is young (see *Fare* v. *Michael C.* (1979) 442 U.S. 707, 724-726 [61 L.Ed.2d 197, 212-213, 99 S.Ct. 2560]), illiterate (see *Tague* v. *Louisiana* (1980) 444 U.S. 469 [62 L.Ed.2d 622, 100 S.Ct. 652], on remand 381 So.2d 507), or mentally deficient (see *Henry* v. *Dees* (5th Cir. 1981) 658 F.2d 406, 409-410; *Jurek* v. *Estelle* (5th Cir. 1979) 593 F.2d 672, 677, rehg. en banc (1980) 623 F.2d 929, cert. den. (1981) 450 U.S. 1001 [68 L.Ed.2d 203, 101 S.Ct. 1709]), his *Miranda* waiver is more likely to be held invalid. Here, however, defendant was a 28-year-old businessman who apparently had regular dealings with lawyers. But for the subsequent appearance of an attorney, no one would have questioned his ability to fully comprehend and evaluate his rights and to waiver them.

Waivers have also been found invalid where the police used trickery to mislead the *suspect* about the meaning of the rights or the consequences of

waiving them. (*Miranda, supra,* 384 U.S. at p. 476 [16 L.Ed.2d at p. 725]; cf. *Fuentes* v. *Moran* (1st Cir. 1984) 733 F.2d 176, 181 [no trickery in failure to inform suspect being interrogated that attorney was asking to see him].) In such cases, the police, by distorting the meaning of the warnings, vitiate their ability to mitigate sufficiently the inherently coercive nature of custodial interrogation. As noted, there is no question here that defendant was fully and properly advised of his rights before his interrogation commenced.

What then was the supposedly critical factor here? An attorney appeared asking to speak with defendant, who had already knowingly and voluntarily waived his right to consult with counsel and to have counsel present during his interrogation. In my view, such an appearance is not so significant as to require termination of the interrogation. A suspect ideally may want to know many things before deciding whether to waive his rights, including the nature of the crime for which he is being investigated, the penalty for the offense, the strength of the People's case against him, the presence of a lawyer in the stationhouse, and countless other matters.[1] While a suspect armed with all this knowledge could make a more informed decision whether to waive his rights, *Miranda* simply does not require such disclosure. (See *United States* v. *Dorsey* (1978) 192 App.D.C. 313 [591 F.2d 922, 932] [valid waiver may occur even though suspect has less information than an attorney might require before offering a legal opinion]; *Carter* v. *Garrison* (4th Cir. 1981) 656 F.2d 68, 70, cert. den. 455 U.S. 952 [71 L.Ed.2d 668, 102 S.Ct. 1458] ["police have no duty, as part of the *Miranda* warnings, to inform a suspect of the crime which they are investigating"].) *Miranda* seeks to strike a reasonable balance between the rights of the suspect and the duties of the interrogator.

If the suspect understands his constitutional rights and the consequences of waiving them, and if the police have not heightened the inherently coercive nature of the custodial interrogation, then the suspect's waiver is valid. As Professor Kamisar has observed, "It is hard to believe that in the course of writing a 60-page opinion *based on the premise* that police-issued warnings

---

[1] Defendant in the present case was in fact apprised of the charges against him, the penalty for the offense, and the evidence the police had to tie him to the crime. The majority relies on the *Burbine* dissent's assertion that the failure there did not involve simply "useful" information, but rather amounted to "affirmative police interference in a communication between an attorney and a suspect." (*Burbine,* 475 U.S. at p. —, fn. 42 [89 L.Ed.2d at p. 443, 106 S.Ct. at p. 1160]; see *ante,* at p. 612, fn. 18.) This ignores the fact that the defendant in this case had already rejected the opportunity to communicate with and have counsel present; the "communication" involved thus was a one-way street, from an attorney seeking access to a suspect *who had already waived his right to talk with him.* The Fifth Amendment right against self-incrimination is the individual suspect's right, not his attorney's.

can adequately protect a suspect's rights the [*Miranda*] court would [next maintain] that such warnings are insufficient when, but only when, a suspect's lawyer is not allowed to consult with him—that even though a suspect has been emphatically and unequivocally advised of his rights and insists on talking, what he says is inadmissible when . . . a lawyer *whose services he has not required has, unbeknown to him,* entered the picture." (Kamisar, Police Interrogation and Confessions (1980) at p. 217, fn. 94.) This is precisely the result rejected in *Burbine*.

The appearance of a lawyer at the stationhouse does not increase a suspect's need to invoke his rights. Neither does an attorney's presence lessen the People's need to gather the facts, a legitimate factor which should be weighed in the equation but which is essentially ignored by the majority. (See *Miranda, supra,* 384 U.S. at pp. 477-478 [16 L.Ed.2d at pp. 725-726].) As Professor Kamisar maintains "There is not even a weak congruence—indeed, there is no congruence at all—between a defense lawyer's entry into the proceeding and a suspect's need for 'a lawyer's help' or the government's need for evidence. Whatever its symbolic value, a rule that turns on how soon a defense lawyer appears at the police station . . . hardly seems a rational way of reconciling the interests of the accused with those of society." (Kamisar, *supra,* at p. 220, fn. omitted.)

The unfairness, illogic, and arbitrariness of the majority's rule is demonstrated by the following hypothetical. Assume the police simultaneously arrest three suspects (A, B and C) of the same age, background and ability. Each is brought to the same police station and put in a separate identical interrogation room. Each is advised of his *Miranda* rights in the same terms and each understands and agrees to waive those rights. Each is specifically advised of his right to have an attorney present during interrogation, or to have one appointed before interrogation begins if he cannot afford an attorney. Further, each is advised he may exercise these rights and refuse to answer questions at any time during the interrogation. Let us assume at this point each of the suspects' waivers is knowing and intelligent. As questioning commences, friends of suspect A retain an attorney for him. The attorney arrives at the station and asks to speak to A. Friends of suspect B retain an attorney for him, but are mistaken about where B is being held and the attorney goes to the wrong police station or decides to wait until the next day to investigate further. No attorney is retained for suspect C. Nothing inside any of the interrogation rooms changes. Should the mere appearance of an attorney retained by friends of suspect A change the way we view the validity of each of the suspects' waivers? Are the waivers of suspects B and C more knowing and intelligent and hence more valid because no attorney has arrived to represent them?

Even if an attorney's ready availability is the crucial fact the majority holds it to be, then a constitutional right to be advised of his presence should not depend on fortuity. If those suspects with retained counsel who appear in the course of interrogation cannot knowingly and intelligently waive their *Miranda* rights, then, a priori, those without the funds or sophistication or friends to retain counsel cannot knowingly and intelligently waive their rights. Presumably, one of the reasons behind *Miranda* was the egalitarian notion that all suspects should know of their rights, not only the sophisticated or intelligent suspect. The majority proposes a rule that is not only illogical, but also unduly favors the wealthy or sophisticated suspect over the poor or ignorant one, and in the final analysis a rule that is built on happenstance rather than equality.[2]

The analysis of the New Jersey Supreme Court regarding the effect of proper waivers is persuasive. "[I]f a defendant was given the *Miranda* warnings, if the coercion of custodial interrogation was thus dissipated, his 'waiver' was no less 'voluntary' and 'knowing' and 'intelligent' because he misconceived the inculpatory thrust of the facts he admitted, or because he thought that what he said could not be used because it was only oral or because he had his fingers crossed, or because he could well have used a lawyer. A man need not have the understanding of a lawyer to waive one. Such matters, irrelevant when the defendant volunteers his confession to a friend or to a policeman passing on his beat, are equally irrelevant when the confession is made in custody after the coercion of custodial interrogation has been dispelled by the *Miranda* warnings. With such warnings, the essential fact remains that defendant understood he had the right to remain silent and thereby to avoid the risk of self-incrimination." (*State* v. *McKnight* (1968) 52 N.J. 35 [243 A.2d 240, 251-252].)

The right against self-incrimination is a personal right. To that end, *Miranda* and its progeny seek to avoid improper coercion which results in an individual giving up his right involuntarily and unknowingly. The majority rule here, however, focuses on the anteroom of the interrogation room and the activities of others outside the suspect's purview, and effectively imports those extraneous activities into the interrogation room itself despite the

---

[2]The majority argues that I am using the doctrine of equal protection improperly; it is a shield against discriminatory treatment, not a sword with which to deprive an accused of his due. (See *ante,* p. 611, fn. omitted.) The point is, however, that equal protection must be afforded to all; *every* suspect is entitled to be advised of the same rights and to exercise or waive those rights as he sees fit. As discussed above, the majority's rule places different suspects in different positions dependent upon whether a particular suspect has friends or relatives who, *despite the suspect's own waiver of counsel,* decide to employ counsel who arrives at the police station before interrogation terminates. Woe to the suspect whose colleagues and friends respect his wishes or are unable to afford counsel willing to arrive at the police station in rapid fashion.

individual suspect's avowed desire to forego the assistance of those outside the room. What is next? Must suspects be warned when they are about to give a statement which conclusively incriminates them? Must a suspect in the interrogation room be informed that a key witness has suddenly died without making a formal statement implicating him?

Another cited basis for the majority's holding is the Sixth Amendment right to counsel, a right which "is analytically distinct from the Fifth Amendment right created by *Miranda. Rhode Island* v. *Innis* [(1980) 446 U.S. 291, 300, fn. 4]." (*United States* v. *Karr* (9th Cir. 1984) 742 F.2d 493, 495.) Generally, the Sixth Amendment right attaches only "'at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' [Citation.]" (*United States* v. *Gouveia* (1984) 467 U.S. 180, 188 [81 L.Ed.2d 146, 154, 104 S.Ct. 2292].) In *Gouveia,* the court explained that both the language and purpose of the Sixth Amendment were served by attaching the right to counsel only when adversary judicial proceedings have been initiated. The language of the amendment requires both a "criminal prosecution" and an "accused." Furthermore, the court stated, the "'core purpose' of the counsel guarantee is to assure aid at trial, 'when the accused [is] confronted with both the intricacies of the law and the advocacy of the public prosecutor.' [Citation.]" (*Id.* at pp. 188-189 [81 L.Ed.2d at pp. 154-155].)

It follows, then, that custodial interrogation prior to initiation of adversarial judicial proceedings does not present the dangers against which the Sixth Amendment right to counsel is aimed. It is true that custodial interrogation, even prior to charge, does present the danger that the defendant will feel compelled to incriminate himself. That, however, is a concern of the Fifth Amendment, not the Sixth.

The majority ignores not only *Gouveia,* but every relevant Supreme Court decision in at least a decade that interprets the Sixth Amendment. Instead, the majority invokes the outmoded holdings in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado* (1965) 62 Cal.2d 338, 348 [42 Cal.Rptr. 169, 398 P.2d 361] (cert. den. 381 U.S. 937 [14 L.Ed.2d 702, 85 S.Ct. 1765]) to support the proposition that the Sixth Amendment right to counsel applies here. (See, e.g., *ante,* p. 610, fn. 14.) In *Escobedo,* the court found constitutional error when the police, during interrogation, refused a defendant's repeated requests for assistance of counsel and neglected to advise him of his right to remain silent. Footnote 35 of *Miranda* described the police conduct in *Escobedo* as a Sixth Amendment violation. (*Miranda, supra,* 384 U.S. at p. 466, fn. 35 [16 L.Ed.2d at p. 719].) As it had in prior cases, the court in *Gouveia*

reiterated that, in retrospect, there were no Sixth Amendment interests at stake in either *Escobedo* or *Miranda*. In *Burbine, supra,* 475 U.S. 412, — [89 L.Ed.2d 410, 426, 106 S.Ct. 1135, 1145], the court made it crystal clear that "subsequent decisions foreclose any reliance on *Escobedo* and *Miranda* for the proposition that the Sixth Amendment right, in any of its manifestations, applies prior to the initiation of adversary judicial proceedings."

In face of this incontrovertible description by the United States Supreme Court of its own precedent, the majority inexplicably relies on now-rejected interpretations of the federal Sixth Amendment right and follows a similar course to that taken in *People* v. *Bustamante* (1981) 30 Cal.3d 88 [177 Cal.Rptr. 576, 634 P.2d 927]. There, this court declined to follow the holding of *Kirby* v. *Illinois* (1972) 406 U.S. 682 [32 L.Ed.2d 411, 92 S.Ct. 1877], in which a plurality of the high court held that counsel was not required until "the initiation of adversary judicial criminal proceedings." It therefore concluded there is no federal right to counsel at preindictment lineups. A majority of our court held, however, that such a right nonetheless existed independently under the California Constitution. (*People* v. *Bustamante, supra,* 30 Cal.3d at pp. 98-99.)

As a general rule, I take exception to basing holdings such as this on independent state constitutional grounds where the language of the applicable provisions is almost identical to the federal Constitution, and without some greater showing of an independent state interest needing additional protection.[3] Any argument for such holdings is further weakened in this case by the majority's failure to realize that the guaranties of the Fifth and Sixth Amendments, which it invokes in its extension of rights here, protect the rights of *individuals* accused or suspected of crimes. They do not exist in the abstract to proscribe any police conduct of which the majority disapproves. In *Bustamante, the defendant sought and was refused the right to counsel* at the preindictment lineup. (*Id.* at p. 93.) Here, of course, *defendant had waived his right to counsel;* counsel would have been present had defendant requested such assistance. Nothing the police did after the initial valid waiver increased the coerciveness of the interrogation. Defendant's *Miranda* waiver remained constant and valid throughout. Similarly, neither the retention nor the arrival of Attorney Gowdy magically trans-

---

[3]Despite the majority's suggestion that this approach is "novel and ambiguous" (see *ante,* p. 609, fn. 13), the idea that this court should not easily depart from federal interpretation of similar constitutional language has frequently been suggested by others. (See, e.g., *Allen* v. *Superior Court* (1976) 18 Cal.3d 520, 537 [134 Cal.Rptr. 774, 557 P.2d 65] [dis. opn. by Clark, J.]; *People* v. *Disbrow* (1976) 16 Cal.3d 101, 118-121 [127 Cal.Rptr. 360, 545 P.2d 272] [dis. opn. by Richardson, J.].) It is the majority's suggestion that adherence to federal precedent "puts the cart before the horse" that is contrary to long established procedure.

formed the interrogation into a critical phase of an adversary judicial proceeding. Therefore, the Sixth Amendment right to counsel never attached and, even if it had, it had been knowingly and intelligently and *sufficiently* waived.

The majority reasons backwards from the police conduct it wishes to proscribe to the constitutional justifications it declares proscribes that conduct. One consequence of this reasoning is to invest lawyers with an absolute right to see defendants and to interrupt an on-going interrogation. My colleagues argue, as did the *Burbine* dissent, that the conduct at issue here involved "'information' [withheld] by the police [which] bears directly on the right to counsel that police are asking the suspect to waive." (*Burbine, supra,* 475 U.S. at p. —, fn. 42 [89 L.Ed.2d at p. 443, 106 S.Ct. at p. 1160]; *ante,* p. 612, fn. 18.) This view presupposes that *counsel* may affirmatively invoke the "right" to communicate with the suspect. It ignores the fact that in such instances the defendant has waived *his* right to speak with counsel and to have counsel present.

As noted, I fail to see the difference between a case where counsel has been retained but does not arrive at the police station while his client, who has validly waived his right to counsel, is being interrogated, and a case where the counsel does arrive, insisting on counsel's "right" to speak to the suspect. The majority concludes that "If the lawyer comes to the station before interrogation begins or while it is still in progress, the suspect must promptly be told, and if he then wishes to see his counsel, he must be allowed to do so." (*Ante,* p. 610.) I can think of no other instance where a constitutional right is dependent upon the arrival of a third person at a fortuitous moment. The right to counsel previously has equally attached for *all* defendants in the same manner at various critical stages of the adversary judicial process. Apparently now, however, the right to counsel as well as the right against self-incrimination take on new dimensions and afford additional protection to a select group of defendants for whom counsel, unbeknownst to and unsolicited by them, has arrived outside the interrogation room door.

As the court repeated in *Burbine,* "Custodial interrogations implicate two competing concerns. On the one hand, 'the need for police questioning as a tool for effective enforcement of criminal laws' cannot be doubted. [Citation.] Admissions of guilt are more than merely 'desirable,' [citation]; they are essential to society's compelling interest in finding, convicting and punishing those who violate the law. On the other hand, the Court has recognized that the interrogation process is 'inherently coercive' and that, as a consequence, there exists a substantial risk that the police will inadvertently traverse the fine line between legitimate efforts to elicit admissions and constitutionally impermissible compulsion. [Citation.]" (475 U.S. at

p. — [89 L.Ed.2d at p. 424, 106 S.Ct. at p. 1144].) Justice Traynor explained the importance of these factors well in his concurring opinion in *People* v. *Garner* (1961) 57 Cal.2d 135, 162-164 [18 Cal.Rptr. 40, 367 P.2d 680]: "The perpetrator of a crime is normally the one who knows most about it, and his confession, voluntarily made, is often the best evidence of his guilt that can be obtained. [Citations.] Only overwhelming social policies can justify the exclusion of such vital evidence . . . . [¶] So long as the methods used comply with due process standards, it is in the public interest for the police to encourage confessions and admissions during interrogation." (Fn. omitted.)

The majority fails to accord any weight to that "public interest." In reaching their goal, my colleagues cite no "overwhelming social policy" mandating their result, nor do they ever squarely confront the inherently uneven application of the "right" they now adopt. Rather than advancing the interests of suspects based on independent California constitutional grounds, I believe that the majority here diminishes those interests overall by affording different treatment to different suspects despite the fact that all affected suspects have knowingly and voluntarily waived their Fifth and Sixth Amendment rights. The majority seemingly takes this route in an effort to regulate police conduct of which it disapproves. But the regulation of such conduct beyond that required by the federal and state Constitutions is an appropriate matter for the Legislature, not for the courts.

I find no basis in either the federal or state Constitutions for the rule adopted today and, therefore, I would affirm the judgment.

Respondent's petition for a rehearing was denied December 4, 1986. Panelli, J., was of the opinion that the petition should be granted.